## LI *v.* LI

[No. 203, September Term, 1967.]

*Decided May 2, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Charles H. Mayer,* with whom was *J. Ambrose Kiley* on the brief, for appellant.

*Jackson Brodsky,* with whom was *Ronald P. Seres* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

The husband has taken this appeal from a decree of the Circuit Court for Montgomery County granting the wife a divorce *a mensa et thoro,* awarding her custody of the three

minor children born of the marriage, support for the children, alimony and $1250 counsel fee.

The parties are United States citizens of Chinese descent, both are refined, sensitive and well educated individuals with deep respect for ancestral background. The husband is a neurosurgeon employed by the National Institute of Health at an annual salary of $18,740. The wife holds a bachelor's degree in English Literature and has embarked on studies leading to a master's degree. Both are familiar with the Chinese classics and the wife appears to have come from a family of means. They own and lived in a home in the Bethesda area. They were married in 1949, and the children, a son and two daughters, range in age from 7 to 12 years.

The testimony reveals that from the beginning the marriage lacked compatibility; however the marital relationship did not become seriously strained until the latter part of 1964. At that time the husband is alleged to have denigrated the wife's character in the presence of her sister by making statements tending to convey the idea that the wife was guilty of adultery, stating that while she was working in the the 1964 presidential campaign she went out with "cheap men" and "painted her eyes." The wife's sister also testified that while the husband was confined to a hospital in February of 1965 she had occasion to converse with him by telephone, and during the conversation he accused the wife of going out with men, particularly with a man on New Year's Eve. The wife testified that on two occasions the husband directly accused her of infidelity, once in late 1964, at a time not specified, and a second time while the husband was confined in the hospital in February of 1965. No other person was present when these two accusations were made.

Early in 1965, the husband began spending a great deal of time at home, allegedly staying away from work for more than a month. The wife testified that during this period the husband took an abnormal quantity of barbiturates and, depending upon his mood, which was talkative while he was under the influence of medication, often berated her and lectured her on her inadequacies. She states that he called her "stupid," "uneducated," from "bad stock" and unfit to be in his family.

The wife testified that it was her belief that the condition which eventually led to the husband's hospitalization was caused by an excessive use of barbiturates. The husband insisted that this condition was induced by overwork and that his illness was diagnosed as jaundice. There was no medical testimony offered at the hearing regarding the nature of his illness. In any event, in February, the husband's condition worsened and he was admitted on the 10th of the month to Sibley Hospital. While in the hospital, the husband was placed in the security ward. There is a dispute as to how many times the wife visited the hospital. She maintains she endeavored to see him 5 or 6 times but was allowed to see him only 2 or 3 times, whereas, the husband states that she came to see him on 2 occasions.

The husband denies that while in the hospital he expressed any intention not to return home and claims that the wife told him not to come back. The wife states that she only advised him to take a holiday.

On leaving the hospital March 3, 1965, the husband went to California and stayed with his brother. The wife asserts that she had no knowledge of the husband's leaving the hospital until several days thereafter.

The husband returned from California on April 8, 1965. The following day, in the company of a personal friend, he went to see his family at which time he found that the locks on the doors had been changed. This first visit lasted one hour and a second visit was not made until June. On the second visit, at which time the husband was again accompanied by his friend, the wife became emotionally upset and threatened to call the police. Although the friend left almost immediately, the husband stayed until around midnight and talked with the children. The wife gave as her reason for changing the locks her fear of the husband's unpredictable behavior and that he had threatened to take the children to Hong Kong. Nonetheless, the children became relatively constant week-end visitors in their father's apartment during the fifteen months preceding the hearing in the case. On one occasion they accompanied the father on a trip to Minneapolis. The visitation arrangements seemed to have worked out quite well for all concerned.

On April 17, 1965, after the husband had returned from California and visited his home for the first time subsequent to his hospitalization, he wrote the wife's parents a letter which was given considerable prominence at the hearing. This letter, written in Chinese characters, made reference to the wife's inattention to marital duties and her desire to go out at night and, alluding to an ancient proverbial expression attributed to the Chinese philosopher Mencius, stated the wife "attracted attention like a branch of a tree over spreading the wall." The interpretation given this phraseology by the wife was to the effect that it referred to "a branch of red apricot through the wall" and that the expression in Chinese literature symbolized licentious conduct. This was construed by the wife's counsel as another accusation by the husband of adulterous conduct on the part of the wife. The wife's sister also gave testimony attributing such a meaning to this expression in the original Chinese text.

Counsel for the wife advanced the theory that the husband was guilty of desertion by not returning home after his hospitalization or in the alternative that the husband was guilty of constructive desertion as a result of his excessive use of drugs and accusations of infidelity.

It is evident from Judge Shearin's memorandum opinion that he did not find the husband guilty of desertion, either by entering the hospital or by going to California upon his release. Nevertheless, the court's reliance upon *Poole v. Poole,* 176 Md. 696, 6 A. 2d 243 (1939) and *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325 (1925) compel us to conclude that the divorce *a mensa* was based on the theory that the husband's alleged accusations of infidelity constituted cruelty which justified the wife in barring him from the household, whereby he became guilty of constructive desertion.

It is the settled law in Maryland that a court may grant an *a mensa* divorce where the facts disclose misconduct of a spouse amounting to a constructive desertion. See *Bryce v. Bryce,* 229 Md. 16, 181 A. 2d 455 (1962) ; *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949). Therefore, the salient questions of law in the instant case are 1) whether the husband did in fact accuse the wife of infidelity and, if so, 2) was the accusation

sufficient to amount to such cruelty as would support an *a mensa* decree based on constructive desertion by the husband, even though the conduct would not justify a divorce on the ground of cruelty.

In *Silverberg, supra,* this Court held that wanton and public charges of infidelity against the wife under circumstances which expose her to shame and contumely amounted to cruelty of treatment warranting a divorce *a mensa. Poole, supra,* held that unfounded public accusations of adultery might be so demeaning and destructive to the wife's health as to constitute cruelty justifying her leaving. See also *Myerberg, Constructive Desertion in Maryland,* 10 Md. L. Rev. 193, 201 n. 24 (1949) ; Note, 5 Md. L. Rev. 111 (1940).

The fundamental question in the instant case was whether the statements of the husband may rationally be construed as accusations of adultery. The lower court was apparently of the opinion that the effect of the statement to the wife's sister and the letter written to her parents, considered in the context of oriental tradition and sensitivities, were shameful and revolting accusations that Mrs. Li was unfaithful to her husband. With this we are unable to agree.

We must ignore any statements made privately by the husband to his wife since they would be uncorroborated. Rule S 75. The remaining statements are not clear and unambiguous accusations of adultery, unchastity or infidelity. At most, they may impute that the wife met with other men, but not that she was guilty of any further indiscretion. *Cf. Riley v. Riley,* 239 Md. 363, 366, 211 A. 2d 748, 750 (1965). Although the controversial Chinese phrase in the letter to Mrs. Li's parents may in fact carry the insinuation of an illicit love affair, we are of the opinion that the meaning was so buried in metaphor as to lose its connotation. In addition, it should be noted that the letter was written on April 17, 1965, some time after the wife had already changed the locks on the home barring entry by the husband; the letter, therefore, would not have served either as motivation or justification for her actions at that point.

However, there is another reason for our conclusion that the appellant is not guilty of cruelty. Even if we were to assume

that the obvious innuendo of the husband's statement was an accusation of infidelity, there is no evidence that the wife suffered such injury as is necessary to make out a case of cruelty. As we recently stated in *Murphy v. Murphy,* 248 Md. 455, 460, 237 A. 2d 523, 525 (1968) :

> "Even though the cruelty required in a constructive desertion case may be less than a case wherein an *a mensa* decree is sought on the grounds of cruelty, yet, the objectionable conduct still must be such as to render continuation of the marital relationship impossible, if the complaining spouse is to preserve his or her health, safety or self-respect."

In both *Silverberg* and *Poole,* the husband openly and publicly accused his wife of adultery and clearly intended to both debase and belittle the wife. However, the statements amounting to mental cruelty do not necessarily have to be made in public. In *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792 (1949), the wife made direct statements to her husband and his relatives, which is essentially the same situation as presented by the case at bar. There the wife accused her father-in-law of sexually assaulting her on fourteen different occasions, called her mother-in-law a prostitute, and accused her husband and his parents of thievery. This conduct physically upset the husband to such a degree that his physician advised him to leave the wife for his health's sake. In his absence the wife changed the locks on the house and later sued him for divorce *a mensa et thoro,* alleging desertion and cruelty. The Court of Appeals affirmed the lower court's dismissal of the suit, stating that the evidence unquestionably showed the wife to be guilty of a constructive desertion. However, since the husband did not file a cross bill for divorce, the court could not grant a divorce in favor of the husband.

In the instant case we are able to find neither the public utterances of *Silverberg* and *Poole* nor the detriment to the health of the complaining spouse in *Eberwein.*

We think the chancellor erred in granting the decree for divorce *a mensa et thoro.* The husband also complained of the

amount of counsel fee awarded to the attorney representing the wife. In view of the substantial salary which the husband was earning and the obvious fact that the wife was well represented we are not disposed to reduce the fee.

> *Decree reversed, except for that portion relative to counsel fee, appellant to pay costs.*