# LICCINI *v.* LICCINI

[No. 28, September Term, 1969.]

*Decided November 7, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Stanley R. Jacobs* for appellant.

*William F. Hickey* for appellee.

BARNES, J., delivered the opinion of the Court.

In this appeal, the principal question presented to us for decision is whether or not the Circuit Court for Montgomery County (Pugh, J.) erred in granting the husband, the appellee Luke L. Liccini, who was the plaintiff below, a divorce *a mensa et thoro* from his wife, the appellant Theresa M. Liccini, on the ground of constructive desertion.

The parties were married in the District of Columbia on October 23, 1949, and resided in Montgomery County for approximately 15 years prior to the filing of the bill of complaint by the husband on April 25, 1968, alleging constructive desertion by the wife and praying for a divorce *a mensa et thoro,* custody of the minor children and other relief.[1]

The husband is 44 years of age and is an aeronautical engineer employed by the National Aeronautical and Space Agency. Two children were born of the marriage, a daughter, Lisa, who at the time of the filing of the bill of complaint was 15 years of age and a son, Mark, who was 18 years of age at that time. The daughter resides with the wife; the son resides with another family.

The marriage was a reasonably satisfactory one until 1965 from which time, according to the husband's testimony, "it has been a pretty terrible situation." He fur-

---

1. The husband in August, 1968 filed a supplemental bill of complaint praying for a divorce *a vinculo matrimonii.*

ther testified: "In 1965 my wife started drinking on a daily basis; and she started finding excuses and things to tell me, doing things to harass, calling me all different kinds of names, blaming everything on me and going to some pretty extreme ends." He stated that on January 1, 1967, there was a cessation of marital relations and from that date until April 12, 1968, he continued to occupy separate beds in the same bedroom. On April 12, 1968, the husband left the bedroom and went down to the basement of the marital home where he remained until he left the home entirely on October 19, 1968. In regard to the wife's attempt at a reconciliation in 1967, the husband testified:

"Q. Since your leaving Mrs. Liccini in cessation of cohabitation, has there been any time that she has asked you to reconcile? A. Reconcile. Yes, I say, she has asked for a reconciliation.

"Q. When? A. She's asked that we try to straighten out our troubles, and I agreed. This was mid-'67. And I indicated to her that from my point, the way to do it was to, for her to make a strong effort to stop drinking and we'd go and see a marriage counselor or we would go get someone who would act as a mediator, even to the extent I offered she have someone, a friend or a relative of hers, even, to act as a mediator.

"And she refused under those circumstances and she has always refused to stop—my request that she stop drinking—and she stop and try to straighten out and go to someone who can talk to us, because it's impossible for the two of us to talk together; or it was. I assume it still is."

The wife continued to drink on a daily basis and on one occasion at her brother's home, started an argument and called the husband names; it was "quite an emo-

tional scene." These arguments and name-calling incidents "occurred almost every day, practically, I (the husband) say six days out of seven." They were initiated by the wife. The husband further testified:

"She called me names like 'homosexual,' 'fairy,' 'lazy'; all I was interested in was work; 'cold fish'; that I had no friends; that education really means nothing, I had nothing, we lived like poor people; and I'm a son-of-a-bastard; ugly, that I wasn't a man; that—

"Q. Before whom? Were these made before anyone other than just you? A. Oh, yes. They were made in front of my children, made in front of the children's friends. And she has also said this in front of other people.

"Q. You say in front of 'other people'; do you recall any specific instances? A. Yes. In January —I'm sorry; December 1967 — we had been bowling and she invited people we bowled against that night and people in our own team to come to the house after bowling. Bowling was from 9:30 till about 1:00, so this occurred around 1:00 o'clock in the morning. And the people that showed up was Mr. and Mrs. Hagy and two relatives of theirs who happened to be visiting just for the holidays and had come up to the bowling alleys just to watch the bowling.

"They were the only people that showed up and at that time we sat down, she started talking about the fact that we hadn't had any sex relationships, marital relationships, since January of 1967. And she started to proceed to tell her concept of the reasons, and—

"Q. Which were what, Mr. Liccini? A. Her concept was that I wasn't a man and that maybe there was something wrong with me mentally, something wrong with me physically.

"We tried to stop her, we tried to change the subject. I tried, I told her to stop. I told her that it was embarrassing the guests. The guests tried to stop her, tried to change the subject.

"And this went on for quite a little while and finally, after about forty-five minutes or so, an hour, they got up and left and went home."

A neighbor and friend, Louis Hagy, testified:

"Q. You then after bowling went to the Liccini home? A. Right.

"Q. Can you tell us what, if anything, occurred then at the home? A. Well, we just did a lot of talking. She prepared us, Mrs. Liccini prepared us a snack. There was a lot of conversation going on back and forth. Some was uncalled for. There was one instance, we were speaking of children — our children, her children, their children—and Mrs. Liccini spoke up and said that she didn't have to worry because she had had no sexual relations over a year.

"Q. With her husband? A. She didn't say.

"Q. Did Mr. Liccini engage in the conversation? A. Yes. He spoke a few times that I can remember to, something to the effect that she shouldn't speak this way, or wait till later. I'm not very sure of the exact words.

"Q. Did he attempt to stop her from speaking along that line? A. Yes. We all tried. I myself did, too. We tried to divert to other conversations, other subjects. It just wasn't the proper thing to be doing.

"Q. Was it a source of embarrassment to you? A. Yes; I believe to most of us; to Mrs. Liccini—Mr. Liccini — too. He seemed like he was embarrassed."

The husband stated that as a result of these accusations by his wife, he "just started losing all self-respect

on my part" and was fearful for his emotional and physical well-being.

Shortly before October 19, 1968, when the husband left the marital home, the wife came down to the basement where the husband was sleeping, started arguing, harassing him, calling him names, broke an ashtray and an alarm clock and turned over a coffee table. The husband tried to restrain her when she began throwing things on the floor whereupon the wife slipped and fell, hitting her head on the floor. The parties ended up by wrestling on the floor. The husband further testified that he indicated to his wife that he would be out in a week's time and that reconciliation was most unlikely as he was "fairly convinced that nothing would solve our problems."

The son, Mark, testified for his father that his mother drank and frequently argued with his father. He testified that his mother called his father "a homosexual, cold" and "a son-of-a-bastard." She stated to the husband "you never gave me love" and "you are a cold fish." The son further testified that he believed the parties had not had sexual relations since January 1, 1967, because his mother would call his father a homosexual and that he did not have prowess as a man. On examination by the Chancellor in regard to the effects on his father's health, Mark testified, "he's almost a broken man" * * * "His—he had nerves — his hands, his hands get these things on them, it's just nerves, because she's into him so much. And one time, I believe, a couple of times, she'd hit him a few times." He stated further, "There was the fact that, up yelling all night long, a man can't even sleep, he don't go to work the next morning." Mark also stated that he had noticed a change in his father's health after he moved to the basement and testified "he wasn't as vibrant as he used to be."

The wife described her husband as "a quiet and somewhat withdrawn individual, completely dedicated to his work, who devoted little time to his family and even less to her." She admitted drinking but attributed the drink-

ing to the marital difficulties. She admitted that there had been no marital relations since January 1, 1967, but although she had sought to have relations, her husband had rejected her advances. She admitted calling him names during arguments but denied that she criticized his manhood.

The daughter, Lisa, testified for the wife that she had been present during the arguments at which both parties used such names as "bitch," "bastard" and "son-of-a-bitch." She stated that her mother did drink, but took good care of her and she preferred to remain neutral. In regard to the effect of the marital trouble on her father's health, Lisa testified that he seemed nervous and had lost weight, "but I think he wanted to."

The Chancellor on February 19, 1969, in a careful opinion, after reviewing the facts, stated:

> "The basis of the claim in this case is that of constructive desertion. Under the law, the laws of course recognize that one spouse may leave the other if the party who leaves can not continue to live under conditions which render the continuation of the marriage whereby it will be almost impossible, in fact impossible, for the marriage to continue with self-respect. Courts have held that one spouse may leave the other, thereby rendering the other spouse guilty of desertion or causing the spouse who leaves to leave, when the health, safety and self-respect of the spouse leaving would prevent the parties from continuing the marriage with self-respect.

> "The fact that the wife has been drinking or that she is a drunkard, if in fact she is, or an alcoholic, or that she constantly uses alcoholic beverages on a daily basis, of itself is not a reason for the husband to leave. There must be more than either drunkenness or alcoholism or the excessive use of alcohol in order to justify a husband for leaving his wife. That was de-

cided in the case that arose in this court in the case of Brault v. Brault.

"In this case, however, the Court finds from the evidence that the conduct of the wife — caused a great deal and maybe primarily by her excessive use of alcohol — was more, and of greater degree, more than the use of alcohol as a reason for the separation of the parties.

"The evidence in this case discloses that the wife has accused the husband unjustly of being a pervert, or words similar to that, before others, which words hold a man in public ridicule. A statement like that before others or the public, which 'others' would be, would in the opinion of this Court constitute a reason for a husband to leave.

"The Court does not, however, use that as the main basis for a finding, which it must find from the evidence, that there has been constructive desertion. It also finds from the evidence that the continued use of alcohol by the wife over a period of two years has affected the health of the husband. The Court finds this from the evidence, and also from the fact that it can see itself, on the witness stand, what appears to be to the Court a man whose health has been affected.

"So the Court concludes from all the evidence in this case, which has been amply corroborated by both children, that the continuation of this marriage with safety, health and self-respect is no longer possible. The Court, therefore, finds that the husband was justified in leaving, and that the wife is guilty of constructive desertion."

The Chancellor, however, did not conclude that the evidence established that the husband was entitled to a divorce a *vinculo matrimonii*, being of the opinion that the

constructive desertion by the wife occurred in either April or October of 1968, both of which dates, at the time of the rendition of the opinion of the Chancellor, were less than the required eighteen months' period. The Chancellor awarded custody of both children to the father with rights of visitation to the mother. These rulings of the Chancellor were incorporated in a final decree, passed February 24, 1969. The wife filed a timely appeal from the final decree; the husband filed a cross-appeal and urges that the husband was entitled to a divorce *a vinculo matrimonii* in that the evidence established that the constructive desertion occurred on January 1, 1967, and continued thereafter for the required eighteen months' period, there being no hope or expectation of a reconciliation.

We have concluded that the Chancellor was not clearly erroneous in his findings of fact and that he committed no error in granting the husband a decree *a mensa et thoro* and the custody of the minor children to the husband.

As we pointed out in *Beavers v. Beavers,* 255 Md. 450, 258 A. 2d 203 (1969), filed today, the Maryland law in regard to constructive desertion was carefully reviewed by Judge Singley, for the Court, in the opinion in *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871 (1969). In *Ballan,* we cited with approval and quoted from the opinion in *Murphy v. Murphy,* 248 Md. 455, 237 A. 2d 523 (1968), as follows:

" 'Even though the cruelty required in a constructive desertion case may be less than a case wherein an *a mensa* decree is sought on the grounds of cruelty, yet the objectionable conduct still must be such as to render continuation of the marital relationship impossible, if the complaining spouse is to preserve his or her health, safety or self-respect. *Eberwein, supra.* Obviously, for such a situation to exist, *there must be a pattern of persistent conduct which*

*is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable. * * *' "*
(251 Md. at 742, 248 A. 2d at 874)

In our opinion, the facts in this case support the Chancellor's findings that (1) there was a pattern of persistent conduct which was detrimental to the health of the husband and also (2) that her repeated accusations of homosexuality and lack of manhood not only within the family circle but to others outside that circle, were so demeaning to the husband's self-respect as to be intolerable. Either ground is sufficient to establish constructive desertion; both are present in this case.

### (1)

Although as the Chancellor observed, drunkenness or alcoholism of one spouse is not, in itself, sufficient to establish constructive desertion, nor will a single act of violence ordinarily justify a divorce on the grounds of cruelty, a course of conduct by a spouse may be such, although not sufficient for a divorce on the grounds of cruelty as to make life for the other spouse so unbearable that it renders impossible the continuation of marital cohabitation without the serious impairment of the health of the other spouse. *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792 (1949). In the instant case, there were constant arguments begun by the wife and continuing six days out of seven during the week. There was evidence to support a finding of acute nervousness, loss of weight and a nervous skin disorder on the husband's hands. There was the breaching of family friendships by the wife and demeaning accusations by the wife. There was loss of sleep and a suggestion by the son, that the father could not go to work at times because of loss of sleep. Then too, the Chancellor found by observing the husband on the stand that the husband's health had been adversely affected.

In considering the Chancellor's findings of fact, we

will only reverse if we conclude that the findings were clearly erroneous, giving due regard for the opportunity of the lower court to judge the credibility of witnesses. Maryland Rule 886 a. *Wood v. Wood,* 227 Md. 211, 218, 176 A. 2d 229, 232 (1961). In our opinion, the Chancellor did not err in finding that the wife's constructive desertion had been established.

### (2)

In our opinion, the Chancellor did not err in also finding that the repeated accusations by the wife that her husband was a homosexual, a cold fish and lacking in manhood resulted in a loss of self-respect which made the continuance of the marital relation impossible. These accusations were not only frequently made, but were not confined in expression to members of the family—Cf. *Li v. Li,* 249 Md. 593, 241 A. 2d 389 (1968). These accusations were made to others, including friends and neighbors who were also embarrassed by the accusations. The accusations in the present case were more offensive and degrading than were the accusations in *Eberwein, supra.* We cannot say that the Chancellor's findings in this regard were clearly erroneous.

Nor can we say that the award of custody of the minor children was in error, inasmuch as the testimony does not indicate that the best interests of the children will be adversely affected. The father has permitted the daughter to remain with her mother as she had prior to the decree and the arrangement is apparently working out satisfactorily as a practical matter. If the situation should change, the Chancellor may, of course, consider the best interests of the children at that time.

*Decree affirmed, the appellee to pay the costs.*