BEAVERS *v.* BEAVERS

[No. 5, September Term, 1969.]

*Decided November 7, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, ▉ BARNES, SINGLEY and SMITH, JJ.

*Sheldon P. Schuman* for appellant.

*Charles D. Sanger, Jr.,* with whom was *C. Edward Nicholson* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The principal question in this appeal is whether or not the evidence, taken in a light most favorable to the husband, the appellee Judson Merritt Beavers (the plaintiff and cross-defendant below) is sufficient to support the finding by the Circuit Court for Montgomery County (Mathias, J.) that the wife, the appellant Mary Louise Michael Beavers, constructively deserted the husband.

The parties were married in Kensington, Maryland on February 28, 1942, and have resided in Montgomery County since their marriage. One child, Gay Merritt Beavers, now Mrs. Tatum, was born of the marriage. The husband moved from the marital abode on January 6, 1968; and the husband and wife have not lived together or had any sexual relations since that time.

The marriage was a reasonably satisfactory one until October, 1964, when the husband and wife went on a vacation trip to Nova Scotia with the husband's mother. There was an argument between the wife and the mother-in-law which continued to a point where it was no longer desirable to continue the trip. The trip was shortened and the parties returned home.

In November of 1964 or 1965, the parties and their daughter had attended a golden wedding anniversary celebration of the aunt and uncle of the husband at Colonial Beach. On the way back, according to the husband's testimony, the parties had an argument during which the wife started to beat the husband while he was driving at about 60 miles per hour on Route 301, grabbed the steering wheel and almost upset the automobile.

There was evidence that on one or two occasions, the wife had referred to her mother-in-law (but not in her presence) as "an old son of a bitch and bastard" and on

one occasion had stated that she would "get" her husband one way or the other.

In April, 1967, the parties had visited an attorney to seek to reach an agreement. No separation agreement was reached. The husband returned to the marital abode at about 10:30 P. M. prior to the arrival of his wife who arrived home at about 11:45 P. M. when according to the husband, the wife was very hostile and angry. Without provocation, she "flew into" the husband, scratched him on the face, nose and arm, clubbed him and threw his travel clock out of the bedroom. The husband then took some clothing and left for the home of his cousin, who cleaned the scratch wounds and applied medication. The husband, who was employed by Montgomery County in the enforcement of safety and building regulations, called in for a day of "sick leave" because he did not want "to walk around looking like he had been in a cat fight." He explained to his supervisor at luncheon that day what the situation was and showed him his scratches. Thereafter, the husband spent two months at his mother's home, after which he obtained an apartment in the Governor's House apartments.

The wife communicated with the husband in August, 1967. The parties met and drove to Great Falls to discuss their marital difficulties. They became reconciled and the wife lived with the husband in the apartment in Governor's House until they obtained a new apartment in the Warwick Towers in Silver Spring. They moved into the new apartment in October, 1967. Later in that month while in the hall of the apartment house while the parties were going for a visit to the apartment of another tenant, the husband testified that the wife struck him on the side of his head near his left eye with her pocketbook. The wife testified that she carried a small purse and hit the husband on the shoulder, not to injure him but to keep him from using "pretty bad language" which she was afraid would be heard by the other tenants. The wife claimed that the husband struck her and that she had stated as much when she reached the apart-

ment to which the parties were going. The husband claims he "might have touched her; I did not strike her."

On the evening of Christmas 1967, the parties met with the husband's mother and other relatives at dinner in a Georgetown restaurant. An argument ensued and the husband and wife left the party. On the way home, in a heavy rain, the husband testified that the wife stated that "you let those bastards sit there and call me everything in the book." She then grabbed the steering wheel of the automobile and the car barely missed a "freeway column." This was repeated and the husband stopped the automobile several times. He claims the wife scratched, clawed and kicked him, tore his shirt and pants, kicked him in the ribs, tore open his Christmas gifts and threw them into the street as well as his binoculars. The wife's version is quite different. She testified that the husband had hit her with his hand giving her a black eye. She was trying to blow the horn to attract, if possible, a policeman to come to her aid, and was not attempting to grab the wheel. She denies tearing her husband's shirt. The husband denies that he struck his wife in the eye, but suggested that she might have struck the dashboard when he had to throw on his brakes suddenly because of her conduct. In any event, there was independent testimony that the wife did have a black eye after the return home. After their return home, the parties did not speak to each other. The husband testified he went to the den and laid down on his back on the sofa with his eyes closed; the wife came in and struck him with her clenched fist cutting his upper and lower lip. A day or two later the husband went to see his physician.

On December 29, 1967, the husband was leaving the apartment garage and testified that the wife drove her car directly across the exit way and blocked his exit. He backed away and waited eight to ten minutes. After again trying to leave, while he was passing the wife, she pulled out of a parking space and struck his car. The wife's version of this episode is quite different, she testifying that the driveway was covered with ice and she

accidentally "slid into his car" thereby "making a little dent."

The husband had made arrangements with the landlord of the apartment company to move from the twentieth floor apartment, containing two bedrooms, to an apartment on the sixteenth floor with one bedroom. The husband testified that the twentieth floor apartment was too large and too expensive. The husband claims he had told the wife of the contemplated change in apartments; the wife denies this and claims that the furniture and her clothes were moved without her knowledge and when she was not present. Upon examination by the lower court, the husband testified:

> "Q. When you made arrangements to move from the apartment up there from the 20th floor to the apartment on the 16th floor, had you planned at that time to establish your wife in the apartment on the 16th floor and then leave?
>
> "A. To establish her, if things hadn't gotten better. I was surely going to leave, yes, sir.
>
> "Q. That is the reason you made the move then; is that right?
>
> "A. I would say that was part of it in case I did have to leave, if things continued to continue under the conditions that they were."

The husband also testified that other considerations for the move were the expense involved and the possible erection of a new tower by the apartment company which would cut off some light and air from the 20th story apartment.

On January 4, 1968, the wife returned to the 20th story apartment after a dental appointment. She received a telephone call from her daughter Gay that her baby was sick and she asked her mother to meet her at the Suburban Hospital. The husband asked to go with the wife and although he refused to drive the wife to the hospital in his car, he drove to the hospital with her in her car. Later, the wife was shown the new apartment.

The final episode was on January 6, 1968, when the husband was moving some stereo records to his mother's for storage. The wife, claiming that some of the records belonged to her, grabbed the records, stomped on them with her heel and broke many of them. The wife denies this, but testified that she tried to persuade her husband not to take the records to his mother's home. The husband moved out that same day. The wife testified that she did not realize that he was leaving until she discovered that he had moved all of his clothes out.

The husband testified that marital relations had ceased between the parties in November or December of 1967; the wife claimed these relations had continued until the husband left in January, 1968.

The wife testified in regard to excessive drinking on the part of the husband. There was some independent evidence to support this. The husband, although admitting that he was a social drinker, denied that he used alcohol to excess.

It was not disputed that the wife suffered from a duodenal ulcer, for which she received medical treatment from time to time. Her physician testified in regard to this condition and its treatment and had advised her to retire from her work with the Government of the District of Columbia, which advice she had followed and was retired before January 6, 1968. There was no medical testimony offered by the husband. The wife also claimed that the husband on many occasions stayed out quite late at night and she did not know where he was. She also claimed that the husband had not adequately supported her after her retirement from her work for the District of Columbia.

The husband filed a bill of complaint alleging that the wife had been cruel to him by words, acts and deeds, and her conduct was such that it became impossible for the husband "to continue to live with her without loss of health, safety, and self-respect, and he was in fear of bodily injury, and as a result, on or about January 6,

1968, he removed himself from the marital home * * *."
The husband prayed for a divorce *a mensa et thoro,* for
an adjudication of personal property rights and for other
and further relief. The wife denied these allegations in
her answer and thereafter filed a cross-bill of complaint
based upon desertion, cruelty and conduct causing a loss
of health, safety and self-respect. She prayed for a di-
vorce *a mensa et thoro,* temporary alimony, permanent
alimony, counsel fees, an adjudication of personal prop-
erty rights and for other relief.

The lower court in its opinion concluded:

> "The Court finds from the evidence that the
> wife's unreasonable and abusive conduct to-
> wards her husband was such as to justify his
> leaving the marital domicile. We will, there-
> fore, award him a divorce *a mensa et thoro* on
> the ground of constructive desertion. The wife's
> cross-bill must be dismissed."

A final decree was passed on January 13, 1969, di-
vorcing the husband *a mensa et thoro* from the wife,
making provisions for the personal property of the par-
ties, allowing the wife a counsel fee for her counsel and
requiring the husband to pay the costs. A timely appeal
was taken by the wife from this final decree. In neither
the briefs nor the arguments are the provisions of the
decree in regard to personal property rights, counsel fee
and costs challenged. The wife claims that the lower
court erred in granting the husband a divorce *a mensa
et thoro* and in failing to grant her a divorce *a mensa
et thoro* with appropriate alimony.

We have concluded that under the applicable decisions
of this Court, there was not sufficient evidence to sup-
port the Chancellor's finding of constructive desertion by
the wife. Hence, the Chancellor was in error in granting
the husband a divorce *a mensa et thoro* and in declining
to grant such relief with appropriate alimony to the wife
on her cross-bill because of his desertion of her, the evi-

dence showing, without dispute, that there is no hope of reconciliation. We shall reverse the decree for this error and remand the case to the lower court for the entry of a decree dismissing the husband's bill of complaint and granting the wife a divorce *a mensa et thoro,* with appropriate alimony as found by the Chancellor upon the remand, with an allowance of a proper counsel feé for counsel for the wife for his legal services on this appeal as well as for the value of any additional services as determined by the lower court upon the remand.

In our opinion, the present case is controlled by our recent decision in *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871 (1969). In *Ballan,* over two months before the husband left the marital abode the wife stopped speaking to the husband, stopped preparing his meals and stopped making his bed. When he went to bed, the wife would proceed to clean the bedroom in a noisy fashion. Not only did the wife not make his bed, but she placed cigarette butts, ashes and hard candy in it. When he tried to sleep, the wife turned up the volume on the television set in the bedroom so that it was difficult to sleep. When the husband moved the television set to the living room, the wife hit him with a tensor lamp and stated that she "threw everything I could lay my hands on at him." In *Ballan,* marital relations had continued until January, 1967. The husband moved out of the marital abode on March 2, 1967. In *Ballan,* the husband, as here, filed a bill of complaint for a divorce *a mensa et thoro* on the ground of constructive desertion and the wife countered with a cross-bill of complaint on the ground of actual desertion. The Chancellor in *Ballan,* however, concluded that although the husband had good reason for leaving, he was not legally justified in doing so. He dismissed the husband's bill of complaint, and granted the relief prayed for in the wife's cross-bill. In affirming the decree in *Ballan,* this Court, in an opinion by Judge Singley, reviewed the prior Maryland cases including *Fuller v. Fuller,* 249 Md. 28, 237 A. 2d 925 (1968) and cases therein cited, *Kerber v. Kerber,* 240 Md. 312, 214 A. 2d

164 (1965) and cases cited therein, as well as *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792 (1949) and cases following *Eberwein,* such as *Harrison v. Harrison,* 223 Md. 422, 164 A. 2d 901 (1960), *Scheinin v. Scheinin,* 200 Md. 282, 89 A. 2d 609 (1952), as well as *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475 (1941), and *Murphy v. Murphy,* 248 Md. 455, 237 A. 2d 523 (1968), and concluded that the evidence was not sufficient to legally justify the husband's leaving the marital abode. Judge Singley, for the Court, stated:

> "Judge Finan, speaking for the Court in *Murphy,* articulated the rule:
>
>> 'Even though the cruelty required in a constructive desertion case may be less than a case wherein an *a mensa* decree is sought on the grounds of cruelty, yet the objectionable conduct still must be such as to render continuation of the marital relationship impossible, if the complaining spouse is to preserve his or her health, safety or self-respect. *Eberwein, supra.* Obviously, for such a situation to exist, *there must be a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable.* * * *' 248 Md. at 460 (Emphasis added.)
>
> "Objectionable as Mrs. Ballan's conduct was, it is found wanting if weighed in the balance against the rule of the cases. In *Eberwein, supra,* the wife accused her father-in-law of attacks on her on 14 occasions; accused her husband and her mother-in-law, who were post office employees, of stealing from the mails, with the result that they lost their jobs; and accused her husband of stealing from supermarkets. There was testimony that this had jeopardized the husband's job security and his health. *See*

*also, Poole v. Poole,* 176 Md. 696, 6 A. 2d 243 (1939) and *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325 (1925), which held that unfounded public charges of infidelity constituted cruelty, but *compare Li v. Li,* 249 Md. 593, 241 A. 2d 389 (1968), where the statements were made only to the wife's family.

"*Eberwein* should be contrasted with *Ritz v. Ritz,* 188 Md. 336, 52 A. 2d 729 (1947) where there was testimony that the wife hit the husband on the head with a hammer, stabbed him three times in the arm with a screwdriver, and was so noisy and quarrelsome at night that the husband got no more than three hours sleep a night for the six months preceding his departure and slept while at work. Our predecessors held that since this conduct did not endanger the life, person or health of the husband, it did not amount to constructive desertion. *Accord, Hyatt v. Hyatt,* 173 Md. 693, 196 A. 317 (1938) ; *Mason v. Mason,* 181 Md. 666, 30 A. 2d 748 (1943). In the absence of testimony that Mr. Ballan's health was impaired or threatened, we think the case is controlled by *Ritz* and not by *Eberwein.*" *Ballan,* 251 Md. at 742-743, 248 A. 2d at 874.

In the present case, an alleged refusal of sexual relations by the wife in April, 1967, was eliminated as a ground for a divorce *a mensa* by the reconciliation of the parties in June, 1967. The husband testified that there had been a cessation of sexual relations in November or December of 1967, but there was no evidence of any request made by him and refused by the wife. Then, too, there was not even slight corroboration of the cessation of sexual relations and, indeed, the wife testified that sexual relations continued between the parties until shortly before January 6, 1968, when the husband left.

Nor was the conduct of the wife toward the husband,

as testified to by the husband, sufficient, in our opinion, to be so detrimental to the safety or health of the husband as to justify legally his leaving the marital home. It was significant that although the husband testified that he had consulted a physician at one time, the physician was not produced as a witness. The husband only lost one day's work because of his scratched face, and even here, the husband's testimony suggests that he was physically able to perform his work. There was testimony in regard to the husband's "nervousness" after he left his wife the first time but here again, it did not impair his job, or prevent his subsequent reconciliation with his wife.

The wife's abusive language in regard to the husband's mother was not made publicly or even to the mother-in-law directly, the mother-in-law testifying that the wife had called her "stupid, and dumb and naive many and many a time." The abusive language about the members of the husband's family was generally made to the husband or members of the family—Cf. *Li v. Li,* 249 Md. 593, 241 A. 2d 389 (1968), *supra*—and in any event did not charge the husband with infidelity or other conduct demeaning to his self-respect.

The husband testified that he was afraid of the wife "to a degree * * * I don't feel as though I am safe around her. These tantrums can come up any moment." The testimony, however, established that he remained in the marital home until January, 1968, and, indeed, that he drove *with his wife* to the hospital to see their granddaughter shortly before he left. If there were any fear of his wife, it was quite mild inasmuch as she would have had a golden opportunity to have seriously injured or even have killed him while *she* drove the automobile to the hospital. In our opinion, the actions of the husband show that he did not really fear for his life and safety and had no legal grounds for any such fear.

The instant case is to be distinguished from our decision in *Liccini v. Liccini,* 255 Md. 462, 258 A. 2d 198 (1969), filed at the same time as the opinion in the case

at Bar, in which we held that there was sufficient evidence to support a finding by the Chancellor that the wife constructively deserted the husband by conduct which endangered the husband's health and also by the charges of the wife not only to members of the family but also to persons outside the family, that her husband was a homosexual and lacked prowess as a man, thereby so demeaning his self-respect as to be intolerable.

> *Decree of January 13, 1969, reversed and case remanded for the entry of a decree in accordance with this opinion, the appellee to pay the costs.*