# ALBERT J. CHES *v.* MARCELLA H. CHES

[No. 909, September Term, 1973.]

*Decided August 14, 1974.*

The cause was argued before THOMPSON, MOORE and LOWE, JJ.

*J. Seymour Sureff,* with whom was *E. David Silverberg* on the brief, for appellant.

*Donald T. A. Fair,* with whom were *Fair, Vidali, Wagner & Evering* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

On January 25, 1973 the appellant-husband, Albert J. Ches, inserted his key in the door of his residence in Baltimore City and admitted himself into an empty house. Earlier that day his wife, Marcella, had filed a bill of complaint against him for a divorce *a mensa et thoro* on grounds of constructive desertion and, presumably by prior arrangement, a moving van had transported most of the household furniture and furnishings to a destination unknown to Albert.

Appellant's answer was not filed until May 1973. On that date he also filed a cross-bill praying a limited divorce on grounds of alleged desertion by his wife. An all-day hearing was held in the Circuit Court for Baltimore City on August 6, 1973 when the chancellor patiently received the testimony of 11 witnesses, including that of the 21 year old daughter of the parties and their 18 year old son, the maternal grandparents and the paternal grandmother. Thereafter, in an oral opinion from the bench, the chancellor found for Marcella and against Albert who contends here that the evidence was insufficient to support the allegations and prayers of the wife's bill and that the chancellor should be reversed and the cause remanded for the entry of a decree in favor of the husband. We find that the chancellor erred in awarding an *a mensa* decree to the wife, but we also conclude that the husband was not entitled to prevail on his cross-bill.

I

At the time of the hearing, the parties had been married

for 26 years, their union having been solemnized in a religious ceremony in Baltimore in 1947. They had four children. The eldest, their daughter Bonita, was 21 and their son, Ronald, was 18. The ages of the other two girls were 9 and 13. The mother, age 46, was not employed during the period of the marriage. The father, age 47, had been employed some ten years with a real estate development and construction company at a salary of $360 per week and had previously been employed as a manager of the Emerson Hotel. The parties owned their own home on Duluth Avenue in Baltimore. They cared for and educated their children in an apparently exemplary manner. At the time of the hearing Bonita was employed as a mental health associate in the Inner City Community Mental Health Organization. Ronald was about to enter a community college.

The evidence disclosed that when Mrs. Ches "fled" her home, as she put it, on January 25, 1973 there had been no altercation that day between herself and her husband; nor, indeed, had there been any prior discussion of her intention to leave their marital residence and of taking the children with her.

What gave rise to her sudden departure was a confrontation between the parties that occurred some two weeks earlier, on the evening of January 10, 1973. At about 9:30 p.m. on that date the father espied the son Ronald driving his car at a place in Baltimore some fifteen minutes from the Ches home. The son, it developed, was following a vehicle operated by a woman named Florence Sandowich who lived on Streeper Street in Baltimore and who ultimately parked the vehicle in front of her place of residence. Ronald drew up in back of her car; the father came alongside Ronald's vehicle and demanded to know what he was doing. The son replied somewhat defiantly that he was "playing detective" and had "seen all he wanted to see."

The father told him to go home immediately and when the father and son entered the Ches residence, according to the mother's testimony, there was "a lot of screaming and yelling" and when she emerged from her bedroom to find out

the reason the husband replied, "ask your punk son of an investigator about it." The son told her he "had seen all he wanted to see." She further testified that the father was pushing the son and that she thrust herself between them to protect the boy. She stated she would not have interfered if this had been merely a disciplinary action on the part of the father, implying that the father was enraged at the son's surveillance of Mrs. Sandowich. She said she called the father a "bastard" and he yelled at her that he would kill her if she repeated the epithet. She did repeat it and according to the testimony of the mother and son, the father applied his hands to her throat. However, she and the son left the house, Mrs. Ches staying overnight with a next-door neighbor. She testified she left the house because she was in fear of Mr. Ches. The next-door neighbor, in whose home she sought refuge, described her as "hysterical" when she arrived.

According to Mrs. Ches, there had been other "violence" and "threats of violence" during previous years. In March of 1972, she testified, the husband threw an article of clothing at her and struck her, knocking off her glasses. She also said that in a year not disclosed in her testimony, "he gave me a wonderful vacation [in Nassau] and a few weeks later beat me up." Permitted to testify as to how many threats of violence occurred in the 26 year marriage, she replied "possibly 12 to 15." Her testimony, corroborated by that of the daughter and son, was that for some time prior to the incident of January 10, 1973 she was the object of abuse and derision on the part of her husband. Asked on cross-examination to particularize allegations of personal harassment and "treatment amounting to gross indignity," set forth in the bill of complaint, she responded:

> "In '72 and in the presence of my children he constantly called me coocoo. How do you think I felt him saying I needed a psychiatrist, humiliating me, degrading me, telling me I did nothing right. Telling me I did every thing wrong, that I did not keep a clean house, which I love to keep a house clean, I love to work around the house. Wouldn't you consider these degradations, harassment.

Wouldn't you consider somebody calling you coocoo constantly, wouldn't you consider that harassment? If someone was supposed to love you would they do that? "

She was described by her father from the witness stand as nervous and depressed because of her marital difficulties. She herself testified that in March 1972 she saw the family doctor who prescribed librium and she was taking 3 tablets a day. She also related that in October 1972 on two occasions she visited Phipps Clinic of Johns Hopkins Hospital because of her mental and emotional distress. Interrogated as to why she stopped going to Phipps Clinic, she testified:

"Because I felt I knew the answers from within myself. I thought —

Q The answer to what?

A To all the problems I was having in my marital life. The marital stress I was under. The mental anxiety that I was under due to the creation by Mr. Ches in the 6718 Duluth household. That's why I went to Phipps Clinic. I had stated once before that I was very despondent. I was crying and I needed help.

Q What was the answer you found?

A I found the answer within myself.

Q What was the answer?

A Well it's a way of looking at things. You take each day. Nobody can solve the problems for you. I knew that I had had enough of this life with him and I knew I had to get out. If that's what you want to hear. I knew I couldn't take it any longer."

There was no medical testimony with respect to the wife's allegedly impaired health; nor, except for the instances above stated, was there testimony of any other physical abuse nor of any drinking on the part of the husband. The record does not disclose when marital relations ceased. It is clear from the testimony that Mr. Ches was a hard worker,

on 24-hour call in his employment as properties manager. His weekly pay check was given to his wife for deposit to a joint account for the payment of bills. She complained that during the two or three years prior to the hearing he required her to budget her spending and to keep sales slips and invoices, to her great annoyance. He testified, however, that he continued to give her his salary check. His employer, Leonard Frankil, testified on his behalf. It is plain that he regarded Mr. Ches as a conscientious, hard working and valued employee. Appellant's mother and brother also testified and both denied the existence of any improper relationship between appellant and Mrs. Sandowich.

It is quite evident from the record, however, that the mother and two older children were convinced that there was an illicit relationship between the two of them. Mr. Ches denied it and in response to a direct question stated that he had never had relations with Mrs. Sandowich. She was identified in his testimony as a person with whom he had worked in a brewery from 1959 to 1961 and that both she and her husband had visited at the Ches residence. He contradicted the testimony of the mother and children that he had ever admitted keeping company with Mrs. Sandowich and rejected their testimony that Mrs. Sandowich would on occasion come by the Ches residence and blow the horn.[1]

In his disposition of the case at the conclusion of the testimony, the chancellor stated in reference to the somewhat amorphous relationship between the appellant and Mrs. Sandowich:

"This case is one in which there had been a source of contention over a period of many years in the person of one Mrs. Florence Sandowich. *Precisely what the relationship is or was, or if there ever was a relationship between Mr. Ches and Mrs. Sandowich, is not the precise cause of the divorce,*

---

1. Curiously, the son, Ronald, testified that he reported to his mother on the evening of January 10, 1973 as follows: "I said, I just saw my father and the block tonight. We used to call her 'the block.'" Mrs. Ches testified that she first learned of a relationship between her husband and Mrs. Sandowich more than twelve years ago.

*but certainly it was a reason which Mrs. Ches believed existed and which caused this dissension over a period of years.* The evidence, I believe, establishes by a preponderance thereof that Mrs. Ches's physical and mental condition at the time that she left was certainly one of being agitated, depressed, one where her condition had gotten to the point which would certainly appear to be justification for her leaving."

The court immediately went on to state:

"Now the question is the precise cause of that condition, whether it was imaginary, whether it was a result of, as has been suggested here, going through a change of life, or just what caused her to get in this state of mind and health is not abundantly clear. She contends in her testimony, of course, that she left because of the physical act of his threatening to choke her, or actually attempting to put his hands around her neck or putting them around her neck on this occasion of January 10th, so that she was actually in physical fear. But this is combined in her testimony with this long history *of her belief that there was another woman in the picture* and that this all militated against her health, safety, dignity and self-respect."

The chancellor then stated that he found quite significant the testimony of the daughter as to a "course of conduct for approximately six months before the night of January 10, 1973." The chancellor observed:

". . . that for approximately six months her father had engaged in a certain degree of verbal abuse, that the mother had become very nervous and lost weight, and that she was the subject of constant ridicule and slurs. *But the most telling part of her testimony is that she said that on several occasions Mr. Ches said, why don't you get the hell out, and if you don't like it, why don't you*

*get out? This to me is the decisive factor in the case which to me indicates that the course of conduct was such that it was designed by Mr. Ches to end the relationship.* It certainly had not been a happy relationship for either party and from a strictly objective point of view I think they are probably both better off not living under the same roof." (Emphases above added.)

The court then concluded:

"The Court finds from the evidence that the claimant, Mrs. Ches, has established by the greater weight of the evidence that for her to continue to live under the conditions in the household would be detrimental to her safety, health, and demeaning to her self-respect to the extent that the continuation was intolerable. Consequently, I find that she has shown sufficient cause for an a mensa divorce and, on the other hand, that Mr. Ches has not shown by sufficient evidence that she deserted him. Consequently, his cross-bill is dismissed and the relief sought in Mrs. Ches's action will be granted. The divorce a mensa will be granted."

## II

Numerous decisions of the Court of Appeals of Maryland and of this Court have consistently held that the law in Maryland does not countenance a separation of husband and wife except for grave and weighty reasons. *Murphy v. Murphy,* 248 Md. 455; 237 A. 2d 523 (1968); *Harrison v. Harrison,* 223 Md. 422, 164 A. 2d 901 (1960); *Neff v. Neff,* 13 Md. App. 128, 281 A. 2d 556 (1971); *Renner v. Renner,* 16 Md. App. 143, 294 A. 2d 671 (1972).

It is also settled that the conduct of one spouse which causes the other to leave the marital abode may justify a divorce on the ground of constructive desertion, even though the offensive conduct might not justify a divorce on the ground of cruelty. To justify the departure by the offended spouse, however, the conduct must be such as to render

impossible a continuation of marital cohabitation with safety, health and self-respect. *Murphy v. Murphy, supra; Schwartzman v. Schwartzman,* 204 Md. 125, 102 A. 2d 810 (1954); *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792 (1949); *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475 (1941). As Chief Judge Murphy stated for this Court in *Neff v. Neff, supra*:

"For such a situation to exist, there must be a pattern of personal conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable."

The question presented here is whether the conduct complained of by the wife was sufficiently serious to come within the rule stated above and therefore to sanction an award to the wife of a divorce *a mensa* based upon constructive desertion. Upon a careful review of the evidence and re-examination of the decided cases we cannot find the husband's conduct legally sufficient to justify the wife's departure.

Similar on its facts to the instant case is *Neff v. Neff, supra,* where this Court found the husband's conduct insufficient to justify the wife's departure from the home. There, after their marriage in Santa Barbara, California in October 1969 the parties returned to the husband's home in Maryland. On December 17th he struck her in the face with his fist, knocked her to the floor and kicked her. According to her testimony he was intoxicated, used vile language and told her to leave. The husband did not deny these accusations and the wife further testified that the atmosphere in the home until she left four months later was very tense. The following statement by Chief Judge Murphy, writing for Court, (p. 130) is relevant here:

"Her husband was very critical, complained constantly, threatened her well-being by drinking, shook his fist in her face, and repeatedly told her to leave. His general attitude was one of coolness and

disaffection. She testified that *during this period she took tranquilizers."* (Emphasis added.)

Affirming the chancellor's denial of the wife's bill for a divorce *a mensa et thoro* on grounds of cruelty or, in the alternative, constructive desertion, this Court adverted to the rule expressed in *Scheinin v. Scheinin,* 200 Md. 282, 89 A. 2d 609 (1952), that marital neglect, rudeness of manner and use of profane and abusive language does not constitute cruelty; and furthermore, that nagging, austerity of temper, petulance of manner, rudeness of language and even sallies of passion are not of themselves sufficient to justify separation, as a basis for divorce, unless they threaten bodily harm.

In the instant case there is repeated testimony by Mrs. Ches that over the years of this sometimes stormy union her primary concern was "to save the marriage." It is apparent that, as with the wife in *Neff,* she continued cohabitation not through fear, but rather in the hope that the marriage would be saved.

The Court in *Neff,* in support of the conclusion that the evidence was not legally sufficient to justify the wife in leaving the marital domicile to preserve her safety and self-respect, cited *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871 (1969); *Brault v. Brault,* 189 Md. 175, 55 A. 2d 497 (1947); *Ritz v. Ritz,* 188 Md. 336, 52 A. 2d 729 (1947); *Eberwein v. Eberwein, supra,* and *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325 (1925).

In *Ballan,* a leading case, the opinion discloses that some two months before the husband left the marital abode the wife stopped speaking to him, stopped preparing his meals and making his bed. Upon his going to bed the wife proceeded to clean the bedroom noisily. She placed cigarette butts, ashes and hard candy in his bed and turned up the television set in the bedroom making it difficult for him to sleep. The husband moved the television set to the living room and the wife thereupon struck him with a tensor lamp and stated that she "threw everything I could lay my hands on at him." The chancellor concluded that although the

husband had reason for leaving, he was not justified in doing so *legally* and dismissed the husband's bill of complaint. In affirming the decree, the Court of Appeals in an opinion by Judge Singley reviewed numerous Maryland cases and held the evidence insufficient legally to justify the husband's leaving the marital abode.

Among the cases cited in *Ballan* is *Ritz v. Ritz, supra,* where the husband charged and the wife admitted that after attending a moving picture and while driving home, she hit him on the head with a hammer and stabbed him several times in the arm with a screwdriver. The wife also admitted that she struck the kitchen door of the house 8 or 9 times with an axe while her husband was upstairs. The husband testified that he had not been getting more than three hours' sleep at night; that his wife called him constantly at his office, interfering with his work, and accused him of going out with women of ill-repute. A fellow employee testified that the husband would frequently come to work very tired and fall asleep at his desk. The Court of Appeals, affirming a decree of the chancellor which awarded a divorce *a mensa et thoro* to the wife on the ground of desertion by the husband, found that the husband's life and health were not sufficiently endangered as to justify him in leaving the marital abode.

Cruel and vicious conduct on the part of a spouse was held to justify the other spouse in leaving the home where alleged impairment of health was corroborated by medical testimony in *Eberwein, supra.* There the wife accused her father-in-law of sexual attacks upon her on fourteen occasions; accused her husband and mother-in-law, who were employees of the post office, of mail theft causing them to lose their jobs; and accused her husband of stealing from supermarkets and his mother of being a prostitute. The Court of Appeals concluded that the evidence was such as to show that the husband could not with safety and self-respect continue to reside with the wife.

The significance of the medical testimony in *Eberwein* was noted by the Court of Appeals in *Li v. Li,* 249 Md. 593, 241 A. 2d 389 (1968) where, referring to the conduct of the

wife in *Eberwein*, Judge Finan stated: "This conduct physically upset the husband to such a degree that a physician advised him to leave the wife for his health's sake." And in *Beavers v. Beavers*, 255 Md. 450, 258 A. 2d 203 (1969) where there were repeated assaults by the wife upon the husband, Judge Barnes observed for the Court in an opinion reversing the chancellor's finding that the wife constructively deserted the husband, (p. 460):

> "It was significant that although the husband testified that he had consulted a physician at one time, the physician was not produced as a witness."

With respect to the wife's abusive language, the opinion in *Beavers* points out:

> "The wife's abusive language in regard to the husband's mother was not made publicly or even to the mother-in-law directly, the mother-in-law testifying that the wife had called her 'stupid, and dumb and naive many and many a time.' *The abusive language about the members of the husband's family was generally made to the husband or members of the family — cf. Li v. Li,* [supra] *— and in any event did not charge the husband with infidelity or other · conduct demeaning to his self-respect.*" (Emphasis added.)

The Court in *Beavers* was unimpressed with the husband's testimony that he did not feel safe around his wife.

In the instant case also we consider it significant that although the wife and her parents and children testified to her nervousness and depression and that she was taking tranquilizers, no medical testimony was offered. Furthermore, it is apparent that the chancellor based his finding with respect to her departure from the residence upon testimony by the wife of a purely subjective nature. Thus, the court was unable to make a finding that there was indeed a mistress involved and stated: ". . . but certainly there was a reason which Mrs. Ches *believed* existed and which caused this dissension over a period of years."

Certainly an imagined "other woman" would not justify a wife in leaving her husband and, in this case, the incident of January 10, 1973 was surely not of a sufficiently serious nature as a single incident to justify the wife's departure. *See Murphy v. Murphy, supra.* Furthermore, the alleged abusive language in this case falls short of that language and conduct which in comparable situations has been held to constitute insufficient grounds for sustaining a claim of constructive desertion. Again, it is not without significance that the wife returned to the husband and remained with him — apparently without fear — from January 10, the date of the incident, until January 25, affording herself ample opportunity in the interim to consult counsel for the preparation of her bill of complaint and to arrange for the moving of the furnishings on the day the bill of complaint was to be filed.

Based upon our independent review of the evidence, therefore, we conclude that the chancellor erred in granting the wife a decree of divorce *a mensa et thoro* on the ground of constructive desertion. Rule 1086.

## III

There remains for determination the question whether, as urged upon us by appellant, the case should be remanded for the entry of a decree granting the husband a divorce *a mensa et thoro.* As the Court of Appeals noted in *Ballan, supra* (p. 740), the Maryland cases "lay down the rule that for desertion to constitute a ground for divorce, there must be a separation of one spouse from the other without justification, either in the wrongful conduct *or the consent* of the other." (Emphasis added.) That the husband's conduct was not such as to justify a claim of constructive desertion on the part of the wife does not, of course, preclude a finding that she departed with his complete acquiescence. In this case it is abundantly clear that the wife's departure was with the husband's consent. We think that the record fully supports the chancellor's conclusion that Mr. Ches was seeking to end the marital relationship. As the Court of Appeals observed in *Buchholtz v. Buchholtz,* 232 Md. 374, 194

A. 2d 115 (1963): "It is doubtless true that the fact that she took nearly all the furniture and the children with her was not in accord with the husband's desire, but it seems clear that he favored her departure." Testimony in this case by the wife and daughter that he frequently stated the wife could leave "if you don't like it around here," was not disputed by the husband. *See Matysek v. Matysek*, 212 Md. 44, 128 A. 2d 627 (1957). Accordingly, the finding of the chancellor that the husband was not entitled to a divorce *a mensa* will not be disturbed.

> *Decree granting appellee a divorce a mensa et thoro reversed; order of court dismissing appellant's cross-bill affirmed; costs to be paid by appellant.*