## CARPENTER *v.* CARPENTER

[No. 255, September Term, 1969.]

*Decided March 5, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and DIGGES, JJ.

*Robert L. Kay*, with whom were *Harry Protas* and *Protas & Kay* on the brief, for appellant.

*Gerald H. Cooper*, with whom was *A. Thomas Beckman* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

On June 3, 1969, the Circuit Court for Montgomery County (Pugh, J.), after a hearing in open court, signed a final decree divorcing the appellee, Alice Carpenter, who was the plaintiff below, *a vinculo matrimonii* from the appellant, James W. Carpenter, on the ground of constructive desertion. The lower court granted custody of the two minor children to Alice and awarded $600 a month for alimony and child support. The appellant, James, contends in this appeal that there was not sufficient evidence adduced in the lower court to justify a finding of constructive desertion. There is no challenge to the award of custody or to the amount of alimony and child support. In our opinion, the lower court was not clearly in error in its finding of constructive desertion on the part of James, and we shall affirm the final decree of June 3, 1969.

The parties were married on June 4, 1949, the day following James' graduation from the United States Naval Academy. Two children were born as a result of the marriage—James, Jr. aged 17 and Alice Fenimore Carpenter aged 12 at the time of the hearing in the divorce suit.

The parties lived together from the time of their marriage in 1949 until June 26, 1966, except for brief periods when James was at sea or on other naval duty and for a six-week period in 1961 when James was hospitalized in Naval Hospitals in Boston and Philadelphia.

James has three degrees: his B.S. degree from the United States Naval Academy, a degree in Naval Engineering, and a degree of Master of Science in Nuclear Engineering from the Massachusetts Institute of Technology. At the time of trial, he was a Lieutenant Commander in the United States Navy.

There had been incidents of marital discord highlighted by a beating of Alice by James around Christmas, 1960. James admitted that he had struck his wife "many times" and that "back in 1952 or 1953 we used to have fights all of the time that would end up by her not talking, and then gloating for the next couple of days." James described beating his wife around Christmas, 1960 as follows:

> "* * * I took her over my knee and I spanked her, and I spanked her as hard and as long as I could. The only reason I stopped was because my arm got so tired I couldn't lift it off the floor."

In 1961, James voluntarily went to the Naval Hospital in Boston for psychiatric observation. He was later transferred to the Philadelphia Naval Station where he was also under psychiatric observation. He testified that they gave him "a clean bill of health and returned me to duty."

In a letter to Alice dated March 6, 1961, James suggested that she have sexual relations with some of the important people so that he could get a promotion. He also suggested that Alice engage with him in certain repulsive and deviant sexual practices.

In a letter of May 19, 1961, to Alice, James wrote her, "I guess part of my compulsive aggressiveness is revealed by my desire to discuss my sexual fantasies with you."

In May 1966 James' mother-in-law was staying at the house of the parties in Bethesda. She was recovering from a heart attack in April 1966 and was sleeping in the den in order to remain on one floor. For no apparent reason, James flew into a wild rage and told his mother-in-law that she could no longer sleep in the den or sit in his chair. His mother-in-law was much alarmed and fearful that she would have another heart attack. She called her son in Centreville to come and get her, which he did the same day. The mother-in-law testified that James "came down screaming and yelling at me" and "* * * came in the door like a wild man."

Alice testified that her husband's attitude, beginning in January and February 1966 became more abusive and intolerable. He asked her to be a prostitute. He was asking her to sleep with other men. He called her a slut and a pig. He asked her to watch him masturbate. She further testified:

> "He was accusing my father of committing suicide. He was screaming at us. The cherry tree fell over in the wind, and he told me he thought it was my fault. He was screaming and yelling at the children. He would say I was trying to poison him."

We now come to the final episode and the parting of the ways. James testified that he desired to have sexual relations with his wife much more than she wished to have relations. He told her in June 1966 that "* * * if I catch you in the house by yourself I am going to rape you." He said that to her for about one week.
Alice testified:

> "I left him because he beat me up, the 25th of June. I went up to try to get him out of bed at 12:30 that morning, because it was getting to the point where he was just sleeping all the time, and yelling at me the rest of the time, and when I went up to get him, he leaped out of the

bed and shouted all sorts of obscene things at me.

"He knocked me across the room, knocked my little girl out of the room, and he ripped all my clothes off of me, and I had just had a foot operation and he was trying to rip my clothes off of me, and he was going to break my foot, and then Alice ran down to try to call for help, and she got all upset on the phone and she came up.

"By that time he was knocking everything around and I tried to get through that. The next day I had to get my son to camp. He was still going on that night. Alice [the 12 year old daughter] was afraid to go to bed."

\* \* \*

"I realized that night that Alice was afraid even to go up to bed. She stayed down in the den, and Jim was running up and down the steps all night long, shouting obscene things at me, and my son.

"I left. I got Jimmy off to camp and Alice was terrified because Jim was doing all sorts of crazy things, so it went back to what happened to me when he was put in the hospital before that."

As a result of that episode, Alice received three bruises, all approximately one inch in size, one on her neck and two on her arm.

James describes the episode as follows:

"I held her right arm, her right upper forearm, in my left arm. I used my right hand to unsnap the buckle of her shorts, which took me a considerable length of time, about a minute, when I finally got them unbuckled.

"I grabbed both her pants and her undershorts and removed them in one motion. They came off very easily. It was as I was removing them when she said, 'Watch out for my toe.'

"Q. Was she struggling with you while you were

doing this? A. She may have been, but let's
face it, I weigh twice as much as she does."

Mrs. Rhea L. Thomas, the mother of Alice and who
was living with her son in Centreville, testified that when
Alice came to her brother's home on June 26th she was
in "terrible shape." "She was hysterical, and so was the
little girl hysterical, because of what had happened the
day before." She described the bruises (already men-
tioned) which she observed on her daughter's neck and
arm. She further stated that she does not believe there
was any hope of reconciliation—"Because my daughter
is scared to death of her life. She is scared to live with
Jim. * * * She is afraid he will—in a rage he will kill
her, or maybe kill she [sic] or the children."

William Edward Thomas, brother of Alice, drove over
from Centreville on June 25 after Alice had called him
and asked him to come. He testified that when he saw
her, "She was extremely upset, almost hysterical. I would
say almost on the verge of shock. * * * [She] kept say-
ing how afraid she was." He urged Alice to come to his
house that day but "she was obsessed with the idea that
her son Jimmy was going off camping and she wanted
to stay." He offered to stay with her but Alice did not
want that. He advised her to call the police if she had
more trouble and to call him. He stated that his house was
always open and she could come there anytime she could.
Alice and her daughter came to the farm the next day, at
which time "She was still extremely nervous and upset
and didn't know what to do." The daughter "was very
much upset. She was very quiet, went in the room and
stayed to herself."

Alice remained with her brother until August 1966.
After James vacated their Bethesda home, she moved
back there with her two children.

Judge Pugh, in his written opinion, after a review of
the facts stated:

"After reviewing the parties as witnesses in
their own behalf and after considering the evi-

dence corroborating the acts of cruelty, the Court is satisfied that the wife's explanation is more worthy of belief concerning the occurrence on June 26, 1966. Corroborating evidence in a contested divorce need only be slight. The Court therefore finds from the evidence that the wife left the husband because of cruelty of treatment by the husband, and that therefore the husband is guilty of constructive desertion."

We have recently reviewed the Maryland law in regard to cruelty and constructive desertion as a ground for divorce in two opinions filed on November 7, 1969, *i.e.*, *Beavers v. Beavers*, 255 Md. 450, 258 A. 2d 203 (in which we found that there was insufficient evidence to support a finding of constructive desertion) and *Liccini v. Liccini*, 255 Md. 462, 258 A. 2d 198 (in which we found sufficient evidence of constructive desertion had been adduced in the case).

In *Liccini*, we stated:

"As we pointed out in *Beavers v. Beavers*, 255 Md. 450, 258 A. 2d 203 (1969), filed today, the Maryland law in regard to constructive desertion was carefully reviewed by Judge Singley, for the Court, in the opinion in *Ballan v. Ballan*, 251 Md. 737, 248 A. 2d 871 (1969). In *Ballan*, we cited with approval and quoted from the opinion in *Murphy v. Murphy*, 248 Md. 455, 237 A. 2d 523 (1968), as follows:

" 'Even though the cruelty required in a constructive desertion case may be less than a case wherein an *a mensa* decree is sought on the grounds of cruelty, yet the objectionable conduct still must be such as to render continuation of the marital relationship impossible, if the complaining spouse is to preserve his or her health, safety or self-respect. *Eberwein, supra.* Obviously, for such a situation to exist, *there must be a pattern of persistent conduct which*

*is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable. \* \* \*'* (251 Md. at 742, 248 A. 2d at 874)

"In our opinion, the facts in this case support the Chancellor's findings that (1) there was a pattern of persistent conduct which was detrimental to the health of the husband and also (2) that her repeated accusations of homosexuality and lack of manhood not only within the family circle but to others outside that circle, were so demeaning to the husband's self-respect as to be intolerable. Either ground is sufficient to establish constructive desertion; both are present in this case."

(255 Md. at 470-71, 258 A. 2d at 202).

In our opinion, the present case falls within the ambit of *Liccini* rather than within that of *Beavers*. James' obsession with sex and his demands upon Alice to do things properly repugnant to her were so demeaning to her self-respect as to be intolerable. Then, too, the violent rages of James, his admission that he struck his wife "many times" and the violent episodes already discussed, have put Alice in fear of her life and the lives of her children. In our opinion, this is "a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable." *Murphy v. Murphy*, 248 Md. 455, 460, 237 A. 2d 523, 525 (1968). See *Stewart v. Stewart*, 256 Md. 272, 260 A. 2d 71 (1969).

In *Scheinin v. Scheinin*, 200 Md. 282, 291-292, 89 A. 2d 609, 613 (1952), Judge Delaplaine stated for the Court:

"\* \* \* Likewise, although the use of profane and indecent language by a husband does not of itself constitute cruelty, yet a husband's habit of using such language before his wife, especially in the presence of the children, is a ma-

terial fact that may be considered together with other misconduct in establishing cruelty. The fact that a husband curses his wife occasionally, or calls her 'feebleminded' or 'nutty', or casts other derogatory epithets upon her, does not entitle her to a divorce, unless it endangers her health. *Oertel v. Oertel,* 145 Md. 177, 125 A. 545; *McKane v. McKane,* 152 Md. 515, 137 A. 288; *Hillwood v. Hillwood,* 159 Md. 167, 150 A. 286. But where a husband habitually addresses his wife in vile and profane language, and occasionally resorts to acts of physical violence, the entire course of conduct may constitute cruelty, although the physical violence alone may not be sufficient to justify a divorce."

The bill of complaint in the present case was filed on March 6, 1968, prior to our deletion on September 23, 1968, effective October 1, 1968, of Maryland Rule S 75 in regard to corroboration in divorce suits, providing that no divorce decree should be passed upon the testimony of the plaintiff alone, "nor shall the admissions of a defendant in an action for divorce be taken of themselves as conclusive proof of the facts charged as the ground of the action, but in all cases testimony of a person not a party in corroboration of the plaintiff shall be required." As we observed in *Nolte v. Nolte,* 246 Md. 328, 228 A. 2d 240 (1967) Rule S 75 provides for stricter requirements for corroboration than does Code (1957, 1965 Replacement Vol.), Art. 35, § 4. Cf. *Zulauf v. Zulauf,* 218 Md. 99, 145 A. 2d 414 (1958) and *Maranto v. Maranto,* 192 Md. 214, 64 A. 2d 144 (1949).

The hearing in the instant case was not until May 27, 1969, after the deletion of Rule S 75 (effective as of October 1, 1968). It may well be argued that under these circumstances, corroboration by a person not a party was not required, but, assuming for the argument that such corroboration was required, in our opinion, the testimony of Alice's mother and brother, already set forth in

part, was sufficient corroboration. The present case being a contested one, with little likelihood of collusion, even slight corroborating evidence is sufficient. See *Fortman v. Fortman*, 250 Md. 355, 359, 243 A. 2d 517, 520 (1968) and prior Maryland cases therein cited.

The lower court heard the witnesses and evaluated their testimony. Its findings of fact were not clearly erroneous and, in our opinion, no error was committed in granting Alice a divorce *a vinculo matrimonii* on the grounds of constructive desertion.

*Decree affirmed, the appellant to pay the costs.*