649 A.2d 1119

**Daniel LEMLEY**

v.

**Suzanne LEMLEY.**

**No. 259 Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Oct. 31, 1994.

Reconsideration Denied Dec. 27, 1994.

268

270

Nelson R. Kerr, Jr., Rockville, for appellant.

Carole C. Perez, Rockville, for appellee.

Argued before BLOOM, DAVIS and MURPHY, JJ.

DAVIS, Judge.

This appeal by Daniel Lemley is from an order of the Circuit Court for Montgomery County (Turner, J.) that denied exceptions to the report and recommendations of a domestic relations master and affirmed a judgment of absolute divorce in favor of appellee, Suzanne Lemley. Appellant presents the following questions for our review:

I. Did the chancellor err when he made no specific findings concerning the specific allegations of error set out in the appellant's exceptions and pre-hearing memorandum?

II. Did the chancellor err in refusing to permit additional testimony to be adduced at the exceptions hearing?

III. Did the chancellor err with regard to matters of law?

A. Were the facts found by the Master a sufficient basis to show constructive desertion as a matter of law?

B. Should an award of child support be computed on an inflated income, absent voluntary impoverishment?

C. Should no recognition have been given to Dan's non-marital interest in the jointly owned house?

D. Should all contribution have been denied when a *pendente lite* order diverted Suzanne's child support payment to pay the joint mortgage debt?

E. Should rehabilitative alimony have been awarded?

## FACTS

Suzanne Bastian and Daniel Lemley were married in 1975. Mr. Lemley was thirty-five and had three daughters from a prior marriage. Ms. Bastian was twenty-two and had never been married. Two children were born as a result of this union: Stuart, born in 1981, and Warren, born in 1985.

At the time of the marriage, Mr. Lemley was retired from the District of Columbia Fire Department, having suffered a knee injury in the line of duty, for which he received a disability pension. Mr. Lemley made some effort at being employed during the marriage, including stints in real estate sales and a video filming business, but neither venture was successful. He characterized himself as "Mr. Mom," and it appears that he was the primary caretaker of the children. Mr. Lemley's disability income was supplemented throughout most of the marriage by the earnings from Mrs. Lemley's employment. Mrs. Lemley worked part-time at first, then began to work full-time as a legal secretary in 1989. She was still employed in that capacity at the time of trial.

In May of 1991, Mrs. Lemley left the marital home and took the two boys with her. Mr. Lemley filed a petition for "immediate return of the children, custody and child support." Mrs. Lemley filed a cross-complaint for divorce on grounds of constructive desertion. Mr. Lemley supplemented his earlier pleading with a complaint for divorce on grounds of desertion. In the midst of this imbroglio, Mr. Lemley regained possession of the children through "self-help," and Mrs. Lemley's visitation rights were bitterly contested. An attorney for the children was appointed in July of 1991. On July 5, the court issued an interim order for visitation and child support, whereby Mrs. Lemley was required to pay $948 per month.

A hearing on the merits was begun in December, 1992. It ended in April, 1993 after five days of testimony. Mr. Lemley's attorney withdrew after the fourth day of hearings, and Mr. Lemley proceeded pro se during the fifth and final day. On June 10, 1993, the master issued her report and recommendations, and the court granted Mrs. Lemley's complaint

for absolute divorce in a judgment dated June 21. The judgment awarded custody to Mrs. Lemley and ordered Mr. Lemley to pay $673.22 per month in child support. All requests for use and possession, alimony, attorney's fees, and a monetary award were denied.

Mr. Lemley, still proceeding pro se, filed a thirty-three page statement of exceptions to the report and recommendations of the master. Although the exceptions were filed two days late, the chancellor agreed to consider them.[1] Mr. Lemley hired new counsel, and a hearing was held on September 22, 1993. The exceptions were denied in full by an order dated September 28, and Mr. Lemley filed this appeal.

## LEGAL ANALYSIS

The legal effect of Mr. Lemley's exceptions and the chancellor's handling of the issues raised therein are broadly disputed by the parties. Mr. Lemley contends that the chancellor erred in failing to provide an adequate statement of the reasons for his decision on each exception, as required by *Domingues v. Johnson*, 323 Md. 486, 593 A.2d 1133 (1991). Mrs. Lemley contends with equal vigor that the issues raised by Mr. Lemley have been waived because the "rambling incoherent exceptions" do not contain the specificity required by MARYLAND RULE 2–541. We consider each of these procedural claims in the context of constructive desertion, then apply the same analysis to the other substantive issues as appropriate.

### I. Constructive Desertion

In considering the complaint and cross-complaint for divorce, the master's report states:

---

1. According to Mr. Lemley, the exceptions were late due to a misunderstanding between himself and the master's secretary. The secretary allegedly told Mr. Lemley that the master's report was being served by mail, but if he picked up the report in person he would have an additional three days to respond.

The Master finds from the evidence that: the conduct on the part of [Mr. Lemley] during the marriage, including constant derogatory remarks and criticism of [Mrs. Lemley] in private and public, resulted in anxiety and depression on the part of [Mrs. Lemley] requiring treatment; the problems between the parties gave rise to a reasonable fear on the part of [Mrs. Lemley] for her physical as well as emotional well-being; and it was necessary for her to leave the home to protect her physical and emotional health.

The order and opinion of the chancellor, issued after the exceptions hearing, concurs with that conclusion:

The Court finds that the facts contained in the Report and Recommendations of the Domestic Relations Masters' Office are in fact well founded from the testimony presented and although the Court is not bound to accept the recommendation of the Master's Office, in this case he has used his own independant [sic] review of the facts and finds that a divorce to Mrs. Lemley is justifiable.

Mr. Lemley contends that he took specific exceptions to the fact-finding of the master, and that the chancellor erred when he made no specific findings concerning those allegations of error. In light of our decision in *Bagley v. Bagley*, 98 Md.App. 18, 632 A.2d 229 (1993), *cert. denied*, 334 Md. 18, 637 A.2d 1191 (1994), we must agree. We vacate the judgment of divorce and remand for a more definite statement from the court. Mr. Lemley also contends that the facts found by the master are legally insufficient to support a judgment of divorce on grounds of constructive desertion. After addressing the particularity of his exceptions and the appropriate standard of review by the chancellor, we offer guidance on the substantive issue raised by Mr. Lemley.

■ *Particularity.*—While the role of masters generally is governed by Rule 2–541, Rule S74A sets forth specific standards that apply to the use of masters in a domestic relations case. Rule S74A(d) states in part:

Exceptions shall be in writing and shall set forth the asserted error with particularity. Any matter not specifi-

cally set forth in the exceptions is waived unless the court finds that justice requires otherwise.

*Compare* Rule 2–541(h)(1) (containing identical language). If the court is reasonably able to rule on the exception, and the opposing party is reasonably able to frame a response, then the exception is sufficiently "particular" to satisfy the requirements of the Rule. *James v. James,* 96 Md.App. 439, 449, 625 A.2d 381 (1993). *Cf. Pfoff v. State,* 85 Md.App. 296, 301–02, 583 A.2d 1097 (1991), and *G & H Clearing and Landscaping v. Whitworth,* 66 Md.App. 348, 354–55, 503 A.2d 1379 (1986) (both discussing vagueness in context of a complaint).

■ While Mrs. Lemley complains about Mr. Lemley's "rambling incoherent exceptions," her answer to those exceptions directly addressed the main issues raised in this appeal, and we cannot say that the form of the exceptions prevented Mrs. Lemley from framing an adequate response. Mr. Lemley's thirty-three page statement of exceptions is indeed rambling, but it nonetheless contains many specific allegations of error that satisfy the requirements of Rule S74A(d). Mr. Lemley's exceptions include the following statements, which we number for the sake of convenience:

1) ... [T]he Master erred when she said she finds from the evidence of improper conduct on the part of the plaintiff during the marriage including "constant derogatory remarks and criticism of the defendant in private and public, resulted in anxiety and depression requiring treatment."

There was absolutely no evidence.... [at page 2]

2) The statement that this conduct, which is unspecified, resulted in a mental condition which required treatment, is unsubstantiated. There was never a diagnosis presented as to any mental condition or illness that required treatment. [at page 3]

3) There was never an incident in the entire marriage that would cause a reason for fear. [at page 4]

The master's recommendation with regard to constructive desertion is grounded in factual findings that Mr. Lemley

engaged in certain behaviors, and that those behaviors caused fear, anxiety and depression in Mrs. Lemley. Mr. Lemley plainly contests those findings. While Mrs. Lemley and the chancellor may have preferred that Mr. Lemley omit needless words, number his exceptions, and refrain from arguing about evidence not in the record, we could not ask for a more direct assignment of error.

■ *Review by the chancellor.*—The sometimes troubled relationship between master and chancellor has been the subject of several recent opinions by this Court and the Court of Appeals. The difficulty arises in large part from the role that masters play in our judicial system. As we explained in *Ellis v. Ellis*, 19 Md.App. 361, 365, 311 A.2d 428 (1973):

> Litigants in a custody proceeding, as in all judicial proceedings, are entitled to have their cause determined ultimately by a duly qualified judge in a court of competent jurisdiction.

*Accord Domingues*, 323 Md. at 492, 593 A.2d 1133. Simply put, the master is not a judge and is not vested with any part of the State's judicial power. *In re Anderson*, 272 Md. 85, 106, 321 A.2d 516 (1974) *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2399, 44 L.Ed.2d 667 (1975) *Broseus v. Broseus*, 82 Md.App. 183, 198, 570 A.2d 874 (1990); *Levitt v. Levitt*, 79 Md.App. 394, 398–99, 556 A.2d 1162, *cert. denied*, 316 Md. 549, 560 A.2d 1118 (1989). It is the chancellor's role, not the master's, to determine the ultimate rights of the parties.

■■ When a litigant files exceptions to the report and recommendations of a master, the chancellor must "exercise independent judgment to determine the proper result." *Domingues*, 323 Md. at 496, 593 A.2d 1133. *Accord Kirchner v. Caughey*, 326 Md. 567, 572, 606 A.2d 257 (1992). The chancellor must also state, for the record, the reasons for his or her decision. MARYLAND RULE 2–522(a) provides:

> In a contested court trial, the judge, before or at the time judgment is entered, shall dictate into the record or prepare and file in the action a brief statement of the reasons for the decision and the basis of determining any damages.

In *Kirchner*, the Court of Appeals concluded that Rule 2–522(a) applies to "a final judgment in every non-jury action, whether legal or equitable in nature." 326 Md. at 573, 606 A.2d 257. As Judge McAuliffe explained, "the chancellor's opinion should reflect consideration of the relevant issues and the reasoning supporting the chancellor's independent decisions on those issues, and we observe that Rule 2–522(a) requires no less." *Id.*

In *Bagley*, we concluded that something more is required when a litigant alleges that the master's findings of fact are unsupported by the record. Each of the parties to that dispute adopted an erroneous view of the appropriate standard:

> Mrs. Bagley draws no distinction between exceptions alleging erroneous fact-finding and allegedly improper conclusions of law made by the chancellor. Dr. Bagley, on the other hand, argues that *Domingues* mandates only that the trial court independently evaluate the record and not merely 'automatically accept' the master's findings. Dr. Bagley appears to deny that *Domingues* would ever require the chancellor to make specific findings of fact on the record. Neither party correctly understands *Domingues*.

*Bagley*, 98 Md.App. at 29, 632 A.2d 229. Lest there be any lingering confusion, we elaborate further on the requirements of *Domingues* and *Bagley*.

A master's fact-finding is merely tentative and does not become binding until approved by the court. *Wenger v. Wenger*, 42 Md.App. 596, 603, 402 A.2d 94, *cert. granted*, 286 Md. 755 (1979), appeal dismissed per stipulation, January 1, 1980. When the master's fact-finding is challenged, the chancellor must state for the record how each challenge was resolved. *Domingues*, 323 Md. at 496, 593 A.2d 1133. The chancellor may resolve the challenge by relying on the record created before the master. *Wenger*, 42 Md. at 598–99, 402 A.2d 94.

In the case at hand, Mr. Lemley's specific exceptions to the master's fact-finding are swept aside with a broad

statement that the facts found by the master "are well founded from the evidence presented." That statement does not comport with the requirements of *Domingues, Kirchner,* and *Bagley.* The chancellor does not address each challenge separately, nor does he state for the record how he resolved each challenge. At a minimum, he was required to summarize briefly the evidence [2] in the record that supports each challenged fact. *See Bagley,* 98 Md.App. at 29, 632 A.2d 229 (concluding that chancellor who rules on exceptions must sometimes "make specific findings of fact on the record"). This should have been clear from the ruling in *Domingues,* wherein the Court held that the chancellor must determine "which facts are properly before him [or her]" before exercising independent judgment to determine the proper result. *Domingues,* 323 Md. at 496, 593 A.2d 1133. *Compare Cousin v. Cousin,* 97 Md.App. 506, 517, 631 A.2d 119 (1993) (holding that there is no need to address each finding of fact where appellant does not allege specific fact-finding error). Because the chancellor failed to state how he resolved each challenge to the master's findings of fact, we must remand for a more definite statement of his decision.

We are not unmindful of the burden that the chancellor faces in reviewing a challenged finding of fact, particularly in a case such as this where the appellant has submitted a "record extract" containing more than 1,800 pages in ten volumes. *See Bagley,* 98 Md.App. at 30–31, 632 A.2d 229; *Domingues,* 323 Md. at 497, 593 A.2d 1133. In light of the argument presented during the exceptions hearing, which contains many specific citations to the record, we do not believe that the burden here will be unreasonable.

*Constructive desertion.*—In addition to his procedural concerns, Mr. Lemley raises a substantive issue: the facts found by the master, he contends, "were insufficient to show con-

---

2. We recognize that the party filing exceptions has the burden of showing, by appropriate references to the record, that the factual finding at issue was clearly erroneous. The chancellor is not required to scour the record in support of evidence to support each challenged finding of fact.

structive desertion as a matter of law." In her report and recommendations the master reached three conclusions, which we restate for clarity:

1) That Mr. Lemley's conduct—including constant criticism of Mrs. Lemley—resulted in anxiety and depression requiring treatment;

2) That Mr. Lemley's conduct caused Mrs. Lemley to have a reasonable fear for her physical and emotional well-being; and

3) That it was necessary for Mrs. Lemley to leave in order to preserve her physical and emotional health.

Mrs. Lemley's description of the circumstances is more direct. Mr. Lemley's conduct, she contends, amounted to *"ABUSE"* (emphasis in original). During the merits hearing, Mrs. Lemley described one incident in detail:

So, I told him to stop it and to leave, and at this point he really got upset and he sat on top of me. He straddled me and he pinned my arms back and said we were going to talk about it. I told him to get off me, I wanted him to get off me and to leave me alone.

So, he let go of my arms and I started coming up to push him away and he said, "Oh, you want to fight. Is that what you want to do, you want to fight? Well here," and he grabs my wrist with his hand and he is squeezing it very hard and he starts slamming it against the side of his head.

Mrs. Lemley testified that she suffered a bad sprain in her wrist and was required to wear a brace for a week. On another occasion, Mr. Lemley allegedly slammed his fist into the refrigerator door and the basement door. Mrs. Lemley also asserted that Mr. Lemley poured water in her ear when she was trying to sleep, compelled Mrs. Lemley to engage in "coerced sexual relations," and inappropriately discussed the couple's sexual relations in front of the children. The testimony concerning Mr. Lemley's "constant derogatory remarks and criticism" came from several sources. Jane West, an appraiser hired to assess the value of the Lemleys' personal property, testified that Mr. Lemley held a "running conversa-

tion" with himself throughout her appraisal, and that much of that "conversation" centered on "derogatory remarks" about Mrs. Lemley. Both Mrs. Lemley and her therapist testified concerning the impact of these various behaviors on Mrs. Lemley's self-respect and emotional well-being.

Because Mr. Lemley has taken exception to the Master's factual findings, the chancellor must determine whether this evidence is properly before the court. Assuming, *arguendo,* that it is, the chancellor may not grant a divorce on grounds of constructive desertion unless those facts are legally sufficient. *Ches v. Ches,* 22 Md.App. 475, 483, 323 A.2d 651 (1974). We conclude that they are.

With the introduction of "no-fault" divorce based on a voluntary one-year separation, MD.CODE ANN., FAMILY LAW § 7–103(a)(3) (1991 Repl.Vol.), or an involuntary two-year separation, § 7–103(a)(5), the issue of constructive desertion as grounds for divorce rarely reaches this Court. The question, as framed by the Court of Appeals, is whether Mr. Lemley has engaged in "such conduct as would make a continuance of the marital relationship inconsistent with the health, self-respect and reasonable comfort of the other." *Soles v. Soles,* 248 Md. 723, 726–27, 238 A.2d 235 (1968) (quoting *Geisey v. Geisey,* 190 Md. 618, 627, 59 A.2d 319 (1948)). *Accord Sharp v. Sharp,* 58 Md.App. 386, 393, 473 A.2d 499 (1984). There must be "a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, *or so demeaning to his or her self-respect as to be intolerable." Murphy v. Murphy,* 248 Md. 455, 460, 237 A.2d 523 (1968) (emphasis added); *Accord Ches,* 22 Md. App. at 483, 323 A.2d 651. As the italicized language suggests, it is not necessary in every case to show that the safety or physical health of a spouse is threatened; a grave threat to a spouse's self-respect alone may be sufficient. *Murphy,* 248 Md. at 460, 237 A.2d 523. *See also Dupree v. Dupree,* 26 Md.App. 481, 487, 338 A.2d 323 (1975) (noting that there is no need to show "adverse medical effects" in every case); *Liccini v. Liccini,* 255 Md. 462, 470–71, 258 A.2d 198 (1969) (holding that wife's repeated allegations of homosexuality and "lack of

manhood" were so demeaning to husband's self-respect as to be intolerable).

In a case involving constructive desertion, the central issue is whether the offending conduct is so intolerable that the complaining spouse was justified in leaving. *Murphy*, 248 Md. at 460, 237 A.2d 523. Unlike a case involving ordinary desertion, there is no need to show that the "pattern of persistent conduct" was intended to end the marital relationship. *See Bryce v. Bryce*, 229 Md. 16, 23–24, 181 A.2d 455 (1962) (holding that a wife's conduct amounted to constructive desertion despite her "lack of control" due to mental illness).

It is true, as Mr. Lemley suggests, that a single act of direct physical violence *may* not be sufficient to constitute a basis for divorce. *See, e.g., Murphy*, 248 Md. at 460, 237 A.2d 523. It is equally true that nagging, rudeness, and abusive language, standing alone, will generally not justify one spouse in leaving the other. *Stewart v. Stewart*, 256 Md. 272, 279, 260 A.2d 71 (1969) (citing *Stevens v. Stevens*, 183 Md. 599, 602, 39 A.2d 690 (1944)). One single straw will never break the camel's back; but the camel's back may nonetheless be broken. The chancellor must consider the totality of the circumstances, and "where a husband habitually addresses his wife in vile and profane language, and occasionally resorts to acts of physical violence, the entire course of conduct" may constitute grounds for divorce, even though the language or violence alone may not be sufficient. *Scheinin v. Scheinin*, 200 Md. 282, 292, 89 A.2d 609 (1952). *Accord Carpenter v. Carpenter*, 257 Md. 218, 225–26, 262 A.2d 564 (1970); *Dupree*, 26 Md.App. at 486–87, 338 A.2d 323.

Much of Mrs. Lemley's testimony was corroborated by the testimony of Jill Ladd, a social worker and psychologist who had counseled both of the Lemleys. In regard to the allegations of coerced sexual relations, Ms. Ladd explained:

[The reason why] Mrs. Lemley reported that she gave in to him in those circumstances was that she was so concerned that the children might hear him screaming at her and hear the content of their screaming, that she would rather suffer

onto [sic] herself and have intercourse with him to shut him up rather than have the children hear or witness a scene.

The importance of these allegations should not be underestimated. It is well established that the practice of "abnormal" sexual relations by one spouse and a demand for their continuance is indeed "inconsistent with the health, self-respect and comfort of the other spouse," and the spouse who suffers from such demands will be justified in leaving the marital home. *Soles,* 248 Md. at 727, 238 A.2d 235, citing *Maranto v. Maranto,* 192 Md. 214, 220–21, 64 A.2d 144 (1949). *See also Carpenter,* 257 Md. at 220–21, 262 A.2d 564 (where conduct included requests that wife engage in prostitution and other "repulsive" sexual practices). While the petitioning spouse in *Soles* complained of acts that some people may not regard as "abnormal,"[3] that is beside the point. The key to understanding *Soles* and the line of precedent that it follows is to recognize that any *coerced* sexual performance must be regarded as "abnormal," regardless of the specific sexual acts involved, and a persistent demand for such relations may be so demeaning that continuance of the marital relationship becomes intolerable.

In *Dupree,* we placed great weight on the fact that the spouse who suffered abuse left the family home immediately after the last act of violence directed against her. 26 Md.App. at 490, 338 A.2d 323. Mr. Lemley points out that Mrs. Lemley continued to live in the family home for ten months after the injury to her wrist. Because she did, he argues, the situation cannot be described as "intolerable." In his view, Mrs. Lemley's departure was motivated by nothing more than her unhappiness with the "sluggardly pace" of the mediation, her unhappiness with the tensions in the marriage, and "her belief that [he] was going to be intransigent in the mediation."

---

**3.** Mrs. Soles reluctantly told the trial court that her husband "gets more satisfaction from oral sex relations" than she considered normal. *Soles,* 248 Md. at 725, 238 A.2d 235. The Court of Appeals held that a repeated demand for her participation in those acts, standing alone, was sufficient to constitute constructive desertion. *Id.* at 727–28, 238 A.2d 235.

■■ While Mrs. Lemley's departure may have been carefully planned and did not follow closely on the heels of some precipitous event, that does not mean that the situation could or should have been tolerated. As the Court of Appeals explained in *Stewart*, 256 Md. at 282, 260 A.2d 71, "The fact that the wife did not leave immediately does not make the husband's conduct proper. . . ." Recent scholarship on "battered women's syndrome" has taught us that spouses often remain in intolerable situations long after another person might have left. *See generally* Jeanne–Marie Bates, *Expert Testimony on the Battered Woman Syndrome in Maryland*, 50 MD.LAW REV. 920 (1991). No spouse should be penalized for trying to make an intolerable situation work.

■■ We must caution that our discussion of constructive desertion has relied on both the record and the factual findings of the master. While those facts may be legally sufficient to constitute constructive desertion, they do not lead mechanically to a single conclusion. Even if the chancellor finds that those facts are supported by the record, the chancellor must exercise his independent judgment to determine the correct result. *Domingues*, 323 Md. at 496, 593 A.2d 1133. The central issue here is whether the chancellor concurs with the master's conclusion that "it was necessary for [Mrs. Lemley] to leave the home to protect her physical and emotional health." So long as the court's reasoning and the facts underlying that reasoning are adequately stated for the record, the chancellor's independent judgment on that issue must stand unless the decision fails to conform to law or constitutes a clear abuse of discretion. *Cousin v. Cousin*, 97 Md.App. 506, 512, 631 A.2d 119 (1993); *Robinson v. Robinson*, 328 Md. 507, 513–514, 615 A.2d 1190 (1992).

## II. Custody

In recommending that custody be awarded to Mrs. Lemley, the master concluded that Mr. Lemley, "while a loving father, is not the best custodian for the children." Underlying that conclusion were three broad findings of fact with regard to Mr. Lemley's conduct:

A. The master finds that throughout the separation [Mr. Lemley] has inappropriately delegated parental authority to the children, now ages 12 and 8.

B. The master also finds from the testimony that [Mr. Lemley] has interfered and damaged [Mrs. Lemley's] relationship with the minor children. . . .

C. Finally, the Master finds that [Mr. Lemley] provides an inappropriate role model for the children.

The master also found that Mrs. Lemley "is capable of providing well balanced care for the children, meeting their physical and emotional needs, and doing so without disparaging [Mr. Lemley]." Each of these broad conclusions is supported, in detail, with other facts found in the record.

In his exceptions, Mr. Lemley plainly objects to each of those findings. We think it unnecessary to set forth those objections in detail; one example should suffice. At page twelve of his exceptions, Mr. Lemley states:

The Master finds in error that Mr. Lemley delegates parental responsibility to the children.

In ruling on Mr. Lemley's exceptions to the custody order, the chancellor's order and opinion addresses only one of the four broad findings discussed above:

While there are many factors to be considered in rendering a custody decision, one of the most important is the ability of the parents to allow a child to maintain a meaningful relationship with the other parent. Unfortunately the Court does not find that this has always been the case in this matter. Again the Court has carefully reviewed the testimony and the facts adduced therefrom by the Master and feels that they are well supported by the evidence.

Although we do not think the chancellor was required to address each and every point raised by Mr. Lemley's rambling exceptions, we conclude that the chancellor's opinion fails to comport with the requirements of *Bagley*. The chancellor's custody award rests on four broad findings of fact, and Mr. Lemley takes exception with each of those findings. At a minimum, the chancellor was required to address each of

those findings separately, and to state for the record how he resolved each challenge. Because he failed to do so, the issue of custody is remanded.

Mr. Lemley also contends that the chancellor erred by refusing to admit certain testimony at the exceptions hearing. The evidence he wished to present included testimony from three witnesses:

1) Dr. Milton Shore, a clinical psychologist who performed an evaluation of the children;

2) Dr. Robert Lazun, a court-appointed social worker who met with the children and parents weekly for many months; and

3) Michele Glen, "an individual who knows the Lemley family."

He also requested that the chancellor conduct an interview with the children.

Mr. Lemley broadly suggests that the chancellor's refusal to hear additional evidence was somehow "constitutionally wrong, Md. Rules S72A(f)(1)(A) and 2–541(i) to the contrary notwithstanding." His only authority for that proposition is *Stach v. Stach,* 83 Md.App. 36, 573 A.2d 409 (1990). In *Stach,* a standing master recommended that temporary physical custody be awarded to one spouse, and an order was immediately entered, despite the fact that timely exceptions had been filed. 83 Md.App. at 39, 573 A.2d 409. The appellant contended that the order was unconstitutional "because it improperly vests the judicial power and function in a master." *Id.* at 38, 573 A.2d 409. While we held that the order was improper, our ruling was based solely on issues of statutory construction. *Id.* at 40–41, 573 A.2d 409. Indeed, we acknowledged that an immediate order would be proper under different circumstances. *Id.* at 43, 573 A.2d 409, *citing Magness v. Magness,* 79 Md.App. 668, 558 A.2d 807 (1989).

The gist of Mr. Lemley's argument is that the chancellor's refusal to hear additional evidence somehow vests the master with the court's judicial authority. *See Ellis,* 19 Md.App at 365, 311 A.2d 428 (concluding that a master may

not usurp the "ultimate role" of the judge). We find no merit in that argument. The master, in her ministerial capacity, was plainly authorized to hear testimony and make findings of fact. MARYLAND RULE S74A; *See Rand v. Rand,* 33 Md.App. 527, 531–34, 365 A.2d 586 (1976), *vacated on other grounds,* 280 Md. 508, 374 A.2d 900 (1977) (discussing historic role of master in chancery with regard to fact-finding). The chancellor had broad authority to accept those findings (provided that they were not clearly erroneous), or conduct a *de novo* hearing. *Best v. Best,* 93 Md.App. 644, 654, 613 A.2d 1043. The constitution requires only that Mr. Lemley be afforded due process of law, including an opportunity to present his evidence during a hearing appropriate to the nature of the case. *Md. Dept. of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 597, 565 A.2d 1015, *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990). *See also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct 652, 657, 94 L.Ed. 865 (1950). He had that opportunity during five days of hearings in front of the master.

While the receipt of additional evidence is clearly authorized by Rule 2–541(i), there is simply no per se right to present additional evidence at an exceptions hearing. *Rand,* 33 Md.App. at 533, 365 A.2d 586 (citing *Bris Realty v. Phoenix Savings and Loan Assn.,* 238 Md. 84, 88, 208 A.2d 68 (1965)). As we explained in *Best,* the chancellor has broad discretion to rely on the record or conduct a *de novo* hearing. *Best,* 93 Md.App. at 654, 613 A.2d 1043. The chancellor's refusal to hear additional evidence will not be disturbed unless the chancellor was clearly wrong or abused his discretion.

Rule 2–541(i) states that the exceptions shall be decided on the evidence presented to the master unless:

(1) the excepting party sets forth with particularity the additional evidence to be offered and the reasons why the evidence was not offered before the master, and (2) the court determines that the additional evidence should be considered.

During the merits hearing, Dr. Shore's testimony was properly excluded after he stated that the use of his testimony would damage his relationship with the boys. Dr. Lazun testified twice during the hearing, and his second appearance consumes thirty pages of transcript. Other than a brief reference to Stewart's most recent report cards, there is nothing to indicate that Dr. Lazun would have been called upon to provide new evidence. Similarly, Mr. Lemley has failed to indicate why Michele Glen was not available during the merits hearing. While the preference of the children is a factor that *may* be considered in making a custody order, the court is not required to speak with the children. *Levitt v. Levitt,* 79 Md. App. 394, 403, 556 A.2d 1162 *cert. denied,* 316 Md. 549, 560 A.2d 1118 (1989).[4]

In the final pages of his exceptions, Mr. Lemley argues that he was prejudiced during the merits hearing because his attorney failed to prepare adequately for trial and did not effectively present Mr. Lemley's case. While we appreciate Mr. Lemley's asserted difficulties, we have carefully reviewed the transcript from those hearings and conclude that the chancellor did not abuse his discretion in refusing to hear additional evidence.

### III. Child Support

As we noted earlier, Mr. Lemley's sole source of income was a tax-free disability pension of approximately

---

4. Although the master spoke to the children in this case, the parties waived their right to have the interview recorded. The master stated that the interview was not considered in arriving at her findings and recommendations, and the chancellor concluded that the requirements of *Marshall v. Stefanides,* 17 Md.App. 364, 302 A.2d 682 (1973) were satisfied.

During the merits hearing, the court-appointed attorney for the children opined that an interview with the children would be only "marginally beneficial" because there had been "a certain amount of influencing." The statements of the children, he concluded,

"are a little too close to some of the things their father has said on the record at various stages in this case for me to believe honestly that every word that comes out of their mouth is the product of independent thought."

$1,961 per month. In calculating Mr. Lemley's child support obligation under the guidelines, the master used a figure of $2,500 per month. During the merits hearing, Mr. Lemley's attorney explained the difference as follows:

> Mr. Lemley has a disability payment that he receives of approximately $23,500.00 a year tax-free, and since we know it is the custom of the Court to bump up that number to reflect the taxes that he would have to pay, we had an accountant run some computations, and were he paying taxes on his income and Social Security and all the rest, his income would be $30,000 a year or $2500.00 a month.

Thus, the parties stipulated that Mr. Lemley's income was $2,500 per month, and the court's award was based on that figure. Mr. Lemley now contends that the court erred by inflating his income, and we concur.

The parties agree that the challenged practice is the customary procedure in Montgomery County. The record shows that when Mr. Lemley's petition for *pendente lite* support was heard before a different master, the same procedure was followed. In her recommendations with regard to the *pendente lite* petition, Master Rita R. Rosencrantz stated: "The plaintiff has disability income of $1,961.00 per month which is tax-free; 'grossed-up' his income is $2,812.00 per month...."

Mrs. Lemley contends that the issue is not properly before the court because Mr. Lemley waived it. We do not agree. At page 20, Mr. Lemley's exceptions plainly state: "The master utilizes an incorrect figure for the retirement disability income which is actually only $1961 per month." The chancellor's ruling on Mr. Lemley's exceptions does not address the issue at all, except to state that the judgment of absolute divorce signed June 21, 1993 "is hereby affirmed in its entirety." [5]

---

5. Mrs. Lemley further contends that Mr. Lemley waived this exception because he did not object to the argument of her counsel during the exceptions hearing (notwithstanding the fact that Mr. Lemley's counsel argued first and was given no time for rebuttal). There is simply no merit to Mrs. Lemley's argument: in the absence of an express waiver

We must also reject Mrs. Lemley's assertion that Mr. Lemley's stipulation to the figure used by the court was binding and conclusive. We addressed a similar question in *Shrivastava v. Mates,* 93 Md.App. 320, 330–31, 612 A.2d 313 (1992), where we held that the amount of a spouse's child support obligation could not be governed by an otherwise valid separation agreement. The relevant statute clearly states that the amount of support calculated under the guidelines is the correct amount unless application of the guidelines would be unjust or inappropriate in a particular case. *Tannehill v. Tannehill,* 88 Md.App. 4, 15, 591 A.2d 888 (1991). MD.CODE ANN., FAMILY LAW § 12–202(a)(2) (1991 Repl.Vol.). Except for cases in which the court finds a parent to be "voluntarily impoverished," FL § 12–201(b), the guidelines do not permit the use of any figures other than the "actual income" of each parent as defined at FL § 12–201(c). In short, the income of each parent must be determined by the court in accord with the guidelines, and the parties may not stipulate to a figure that is contrary to the law or the evidence. *See Shrivastava,* 93 Md.App. at 330, 612 A.2d 313 (holding that contractual expectations of the parties must give way to the statutory scheme).

 The cardinal rule of statutory interpretation requires that we give effect to the legislative purpose or policy. *Privette v. State,* 320 Md. 738, 744–45, 580 A.2d 188 (1990); *Tracey v. Tracey,* 328 Md. 380, 388, 614 A.2d 590 (1992). While the language of the statute itself is the primary guide to legislative intent, *Tracey,* 328 Md. at 388, 614 A.2d 590, we must also consider the legislative history, as well as the prior state of the law and the "particular evil, abuse or defect" that the statute was designed to correct. *Dept. of Tidewater Fisheries v. Sollers,* 201 Md. 603, 611, 95 A.2d 306 (1953).

In *Voishan v. Palma,* 327 Md. 318, 609 A.2d 319 (1992), Judge Chasanow described the history of the child support

the exception must stand, and the chancellor should have addressed it when he issued his ruling.

guidelines in some detail. The guidelines were adopted to satisfy a federal mandate that determination of a parent's support obligation be based on "specific descriptive and numeric criteria." *Id.* at 322, 609 A.2d 319. The premise of the guidelines is that the goals of equity and consistency in child support awards are best served by stripping the court of most discretion, thereby reducing the decision to a purely mathematical exercise in which support obligations and related expenses are allocated between the parents in proportion to their "actual income." *Id.* at 322–23, 609 A.2d 319. *See also Tannehill,* ·88 Md.App. at 11, 591 A.2d 888 (discussing purposes of child support guidelines).

■ The history of the guidelines and the detail in which they were drafted lead us to conclude that the trial court had no discretion to "adjust" the actual income of a spouse *except as expressly provided by the statute.* Because the chancellor did not conclude that Mr. Lemley was "voluntarily impoverished," the court was required to use Mr. Lemley's "actual income" as defined in FL § 12–201(c). The statutory definition encompasses more than a dozen types of "income," including pensions, FL § 12–201(c)(3)(vi), and "disability insurance benefits." FL § 12–201(c)(3)(xiii). The total income from those sources may be adjusted in one of two ways. The court has limited discretion to make adjustments in "actual income" based on year-to-year fluctuations. *See* FL § 12–203(b) (requiring that actual income be verified through tax returns from the preceding three to five years). Having determined the "actual income" of a parent, the court must then calculate the "adjusted actual income" by deducting alimony, health insurance coverage for the children, and the cost of preexisting child support obligations actually paid. FL § 12–201(d). There is nothing in the statute that expressly authorizes the *upward* adjustment of tax-free income.

■ In choosing between competing interpretations of a statute, we may consider the consequences that would flow from each meaning and should adopt a construction that avoids an unreasonable result. *ANA Towing v. Prince*

*George's County,* 314 Md. 711, 715, 552 A.2d 1295 (1989). Because the legislature plainly intended that the guidelines be applied consistently throughout the state, we cannot conclude that Montgomery County has the *discretion* to "gross-up" tax-free income. Reaching that conclusion would invariably lead to different practices in each county, and some counties may choose to make no adjustments at all.[6] Thus, we confront a difficult choice: if we conclude that the court was *required* to "gross-up" Mr. Lemley's tax-free income, our decision today would be the first of many. Future litigants would ask us to decide, *inter alia,* whether the calculations were properly done in a given case, or whether the income from tax-free municipal bonds should be handled in the same manner as a tax-free disability pension. There is nothing in the statute to guide us on those issues. We believe that such decisions are beyond the province of this Court.

By "grossing-up" Mr. Lemley's tax-free pension, the Circuit Court of Montgomery County undoubtedly intended to place him on equal footing with the many parents who pay taxes on their income. In a broad sense, that strikes us as a reasonable approach. The devil, of course, is in the details, and wrestling with those details is a job best left to the legislature rather than the courts. The award of child support is reversed and remanded for an award based on the actual dollar amount of Mr. Lemley's disability pension.

## IV. Nonmarital Property

The parties began their married life in a home on Whitmore Terrace. Mr. Lemley was sole owner of that property, and he contends that the value of his equity was $35,000 at the time of the marriage. During the marriage the parties jointly maintained and improved the property. Some years later they

---

6. The problem is illustrated by our recent decision in *Reuter v. Reuter,* 102 Md.App. 212, 649 A.2d 24 (1994). Mrs. Reuter testified that she had $1,445 in tax-free income during 1992. The case was heard in the Circuit Court for Anne Arundel County, and there is nothing in the record to indicate that Mrs. Reuter's tax-free income was adjusted in any way.

purchased a second home on Sansbury Court, and the first house was sold. While it is undisputed that "part of" Mr. Lemley's equity was used to acquire the Sansbury Court residence, the master concluded that the second house was entirely marital property. The master's report explained:

> The purchase price on Sansbury Court was $102,000, and they took out a $81,600 first mortgage and a $23,000 bridge loan to cover the purchase price and closing costs. The Whitmore Terrace property then sold for $64,000. The plaintiff testified that "part of" the Whitmore Terrace money then went into the Sansbury Court property as the parties paid off their bridge loan. At the time the Whitmore property was sold, clearly some of the proceeds were marital property and some were not. As the proceeds from Whitmore Terrace were mixed, i.e., marital and nonmarital, and these funds were comingled [sic] and then part of them placed in the Sansbury Court residence, it is impossible to trace nonmarital funds into the Sansbury Court residence with the specificity required by Maryland law.

At no point in his exceptions or his brief does Mr. Lemley specifically dispute that conclusion or the facts on which it is founded. Instead, his brief challenges the chancellor's decision to deny any monetary award. Procedurally, he argues that the chancellor erred by failing to explain the basis for his ruling. Substantively, he argues that his "possession and ownership of a valuable pre-marital asset" should have been considered in the process of determining the marital award.

We have searched in vain through Mr. Lemley's thirty-three page statement of exceptions for some express objection to the master's recommendation that a monetary award be denied. Instead, Mr. Lemley asserted that "[t]he Master did err in handling the antenuptial agreement." The agreement states that any assets accumulated prior to the marriage, including the Whitmore Terrace house, "shall remain forever the property and asset of the owner...." The master concluded that the agreement was invalid:

> In the factual situation here, there was no independent legal advice. The defendant [Mrs. Lemley], 21 years old, was

presented with the agreement the day before the scheduled wedding. The agreement does not pass the first test of being fair in procurement, and cannot govern the parties' rights in this matter.

In his exceptions, Mr. Lemley does not challenge the master's fact-finding; rather, he contends that the agreement is binding notwithstanding the circumstances under which it was signed. Arguably, his concern with the effect of the antenuptial agreement could be read as an objection to the master's conclusion that Sansbury Court was marital property. It could also be read as an assertion regarding the *ownership* of the marital home—a completely separate question. *See Kline v. Kline,* 85 Md.App. 28, 42–43, 581 A.2d 1300 (1990), *cert. denied,* 322 Md. 240, 587 A.2d 246 (1991).

We could wrestle for many pages about the effect of Mr. Lemley's exceptions and those aspects of this issue that have or have not been waived. We think it is unnecessary to do so. Regardless of whether Mr. Lemley properly took exception to the chancellor's denial of a monetary award, the chancellor failed to state adequately the basis for his decision as required by MARYLAND RULE 2–522(a).

The amount of any monetary award must be determined by the court after considering a list of statutory factors set forth in MD.CODE ANN., FAMILY LAW § 8–205(b) (1991 Repl.Vol.). In ruling on Mr. Lemley's exceptions, the chancellor did not specifically address the order denying any monetary award; the chancellor simply stated that his June 21, 1993 judgment of divorce was affirmed. The judgment of divorce states only that a monetary award is denied. The master's report, in turn, simply recommends that no monetary award be made. Neither the master's report, the judgment of divorce, nor the ruling on Mr. Lemley's exceptions state the basis for the court's denial of a monetary award. There is nothing in the record to show that the required factors were considered by either the chancellor or the master at any point in these proceedings.

The chancellor was required to articulate "a brief statement of the reasons" for his decision to deny a monetary award. MD.RULE 2–522(a), *Kirchner,* 326 Md. at 572, 606 A.2d 257. At a minimum, the chancellor must state for the record that the required factors were considered. *Imagnu v. Wodajo,* 85 Md.App. 208, 221, 582 A.2d 590 (1990), *citing Randolph v. Randolph,* 67 Md.App. 577, 508 A.2d 996 (1986). We have also stated that

[a] chancellor is not required to articulate every step in his thought processes. A judge is presumed to know the law and to properly apply it. That presumption is not rebutted by mere silence.

*Bangs v. Bangs,* 59 Md.App. 350, 370, 475 A.2d 1214 (1984).

As Judge Bloom noted in *Kline,* 85 Md.App. at 35, 581 A.2d 1300, certain provisions of the Marital Property Act (the Act) "continue to baffle and confuse bench and bar alike." There is nothing in the record to show that Mr. Lemley's contribution to the Sansbury Court home was addressed when the chancellor denied Mr. Lemley's request for a monetary award. In light of the complexity of the issue, we are unwilling to presume that the chancellor properly considered those contributions. The order denying any monetary award is, therefore, vacated and remanded for a full reconsideration of the issue.

In layman's terms, Mr. Lemley's complaint is poignant and simple. He began the marriage relationship with a valuable asset. He never intended to give it away, but now it is gone. He would like to have it returned, with appropriate regard for the increased value of that asset over the past nineteen years. Unfortunately, the court's power to fashion a remedy for that complaint is limited by the terms of the Act, FL § 8–201 *et. seq.*

Mr. Lemley's premarital interest in the Whitmore Terrace home included both a legal interest (his equity) and a contingent equitable right to have that legal interest treated as nonmarital property in the event that the parties divorced. *See Watson v. Watson,* 77 Md.App. 622, 636, 551 A.2d 505

(1989). Notwithstanding the master's conclusion that the Sansbury Court house was marital property, it is indisputable that some of Mr. Lemley's premarital assets were contributed to the purchase of that house. As we explained in *Kline*, Mr. Lemley is not "entitled" to the return of those assets. The court, when it grants a divorce, is expressly forbidden to transfer ownership of property, real or personal, from one spouse to another. *Watson*, 77 Md.App. at 631–32, 551 A.2d 505; *Nisos v. Nisos*, 60 Md.App. 368, 380–81, 483 A.2d 97 (1984); FL § 8–202(a)(3). The Sansbury Court residence is titled as tenants by the entirety, and the chancellor is powerless to alter that title. Under the circumstances, Mr. Lemley's sole remedy is to have his contributions to the Sansbury Court property considered by the court when it determines the amount, if any, of a monetary award. *Kline*, 85 Md.App. at 44, 581 A.2d 1300. On remand, there are several issues that we think the chancellor must address.

■ *The character of the Sansbury Court residence.*—In light of Mr. Lemley's exceptions, the chancellor must first determine whether the Sansbury Court residence was entirely marital property for the purposes of the Act. The master concluded that nonmarital funds could not be traced to the Sansbury Court residence "with the specificity required by Maryland law." The factual findings underlying that conclusion may be reviewed under a clearly erroneous standard. The conclusion itself may not. *See Domingues*, 323 Md. at 493–496, 593 A.2d 1133 (discussing the distinction between those conclusions which are and are not entitled to deference). The chancellor is required to exercise his independent judgment, and to state the basis of his decision for the record. *Kirchner*, 326 Md. at 572–73, 606 A.2d 257.

*The nature of Mr. Lemley's contribution to the marital home.*—Even if the chancellor concludes that the Sansbury Court house was entirely marital property, he must nonetheless consider "how and when specific marital property . . . was acquired, including the effort expended by each party. . . ." FL § 8–205(b)(8). In *Alston v. Alston*, 331 Md. 496, 507, 629

A.2d 70 (1993), the Court of Appeals concluded that this eighth factor should be given "considerable weight" in determining the amount of any monetary award.

The Sansbury Court residence was titled as tenants by the entirety. With regard to the *ownership* of the property, the title creates a rebuttable presumption that Mr. Lemley intended to make a gift of his Whitmore Terrace home. *Grant v. Zich,* 300 Md. 256, 270, 477 A.2d 1163 (1984).[7] *But see Dorsey v. Dorsey,* 302 Md. 312, 318, 487 A.2d 1181 (1985) (holding that the presumption does not exist with regard to the separate issue of determining whether the property was marital property). The terms of the antenuptial agreement are strong evidence that Mr. Lemley had no such intentions, even if the agreement was not binding between the parties. If the chancellor concludes that Mr. Lemley intended to make a gift, then "[t]he fact of the gift, the value of the property given and the circumstances under which the gift" was made are "important factors" to be considered in determining whether to grant a monetary award. *Kline,* 85 Md. App. at 44, 581 A.2d 1300. If the chancellor concludes that Mr. Lemley did not intend to make a gift, that fact is entitled to even greater weight.

Notwithstanding the complexity of the Marital Property Act, it often produces results that comport with common sense. In his brief, Mr. Lemley concludes that "[c]ertainly possession and ownership of a valuable premarital asset by one party to a case should at least be considered in the third step of the process of determining the marital award." Under the circumstances of this case, that is entirely correct. We must caution, however, that the manner in which the marital home was acquired is but one of the factors to be considered. The chancellor must also consider, *inter alia,* the contributions of each spouse to the well-being of the family and the circumstances which led to the estrangement of the parties. FL

---

7. The result in *Grant v. Zich* and its progeny has been altered by a recent amendment to the Marital Property Act. *See* FL §§ 8–201(e)(2) and 8–205(b)(9). The amendment does not apply to any action filed prior to October 1, 1994.

§ 8–205(b). The statute gives the chancellor broad discretion to reach a decision that is fair and equitable under the circumstances. FL § 8–205(b)(10). *See, e.g., Merriken v. Merriken,* 87 Md.App. 522, 532–33, 590 A.2d 566 (1991). Unless the chancellor abuses that discretion or makes a ruling contrary to law, the chancellor's decision must stand on any subsequent appeal. *Rock v. Rock,* 86 Md.App. 598, 607, 587 A.2d 1133 (1991).

## V. Contribution

In July of 1992, the court issued a *pendente lite* order awarding Mr. Lemley $948 per month in child support. In September, Mrs. Lemley filed a pleading titled "Emergency Ex-parte Motion for Child Support to Mortgage Lender." The pleading explained that:

... [Mr. Lemley] has been responsible for and has been making the monthly mortgage payments of $921.00 on the family home until May, 1992. Since that time, however, [Mrs. Lemley] has continued to make timely child support payments through September, of 1992, but [Mr. Lemley] has failed and refused to make any mortgage payments.

Mrs. Lemley alleged that the mortgage was four months in arrears, and the lender had threatened to foreclose on the property.

The motion was granted by an order dated September 15, 1993. Under the order, Mrs. Lemley continued to make her support payments to the county's Child Support Enforcement Division. The Division, in turn, was ordered to pay Mr. Lemley with two checks. The larger check, for $933.00, was issued jointly to Mr. Lemley and the mortgage lender. As a result, Mrs. Lemley's child support payments were used almost entirely to pay the mortgage, and Mr. Lemley received only $15 per month.

In his amended supplemental complaint for limited divorce, Mr. Lemley requested contribution toward the mortgage. That request was effectively denied when the court denied his request for a monetary award. Mr. Lemley argues that "[e]ither the *pendente lite* Order by which the mortgage

payments were directed was erroneous, or the denial of any contribution was wrong. Both of these matters could have been addressed by a marital award." While Mrs. Lemley now contends that the issue of contribution was not raised in the exceptions, her response to those exceptions specifically addressed contribution, and we are satisfied that the issue is properly before us.

■ According to Mr. Lemley, contribution is required because the mortgage payments were made with nonmarital funds, which could otherwise be used for the support of the children. *See Broseus v. Broseus*, 82 Md.App. 183, 208, 570 A.2d 874 (1990) (Alpert, J., concurring) (noting that contribution is required when mortgage payments are made with nonmarital funds). Mr. Lemley is mistaken. Notwithstanding the child support order, the mortgage was paid from the joint income of the Lemleys. Because the parties were married when the payments were made, they were made from marital funds and contribution is not mandated. *Broseus*, 82 Md.App. at 191–92, 570 A.2d 874; *Prahinski v. Prahinski*, 75 Md.App. 113, 141, 540 A.2d 833 (1988); *Wassif v. Wassif*, 77 Md.App. 750, 766, 551 A.2d 935, *cert. denied*, 315 Md. 692, 556 A.2d 674 (1989). Neither the child support order nor the mechanics of how the payments were made can alter that result.

The issue of contribution between tenants by the entirety is within the sound discretion of the trial court, *Broseus*, 82 Md.App. at 192, 570 A.2d 874, and we find no abuse of that discretion.

### VI. Alimony

With regard to Mr. Lemley's petition for alimony, the report of the master states:

The Master finds that the plaintiff is capable of being entirely self-supporting and, therefore, recommends that the plaintiff's request for alimony be denied.

In his statement of exceptions, Mr. Lemley responds:

The Master did err in denying plaintiff's request for alimony. Much financial damage has been done to the plaintiff

and in all fairness some assistance should be forthcoming. It is hereby requested, that Mrs. Lemley contribute to Mr. Lemley an alimony payment of $400 per month to assist Mr. Lemley in the repair of his credit rating which had been excellent prior to litigation and also allow Mr. Lemley to prepare himself for proper employment, and to assist him in obtaining safe and satisfactory transportation for the family.

Because Mr. Lemley has failed to challenge the master's fact-finding, our decision in *Bagley* does not apply. The court's decision to deny alimony must stand unless it fails to conform to law or constitutes a clear abuse of discretion. *Brodak v. Brodak*, 294 Md. 10, 28–29, 447 A.2d 847 (1982).

■■■. The master's unchallenged finding that Mr. Lemley was entirely self-supporting must dictate the result in this case. As we explained in *Hull v. Hull*, 83 Md.App. 218, 220–21, 574 A.2d 20, *cert. denied*, 321 Md. 67, 580 A.2d 1077 (1990), an award of temporary or "rehabilitative" alimony may not be made unless the recipient spouse is not self-supporting. Indefinite alimony may sometimes be awarded to a self-supporting spouse, but only if "the respective living standards of the parties will be unconscionably disparate." FL § 11–106(c)(2). *Tracey*, 328 Md. at 392–93, 614 A.2d 590. The conclusion that Mr. Lemley was self-supporting was not clearly erroneous. Mr. Lemley does not contend that an unconscionable disparity would exist, nor would the record support such a finding. As a matter of law, no alimony could be awarded on these facts. *Hull*, 83 Md.App. at 221, 574 A.2d 20.

**JUDGMENT OF THE CIRCUIT COURT WITH REGARD TO ABSOLUTE DIVORCE, CUSTODY AND A MONETARY AWARD VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**JUDGMENT WITH REGARD TO CHILD SUPPORT REVERSED AND REMANDED FOR AN AWARD CONSISTENT WITH THIS OPINION.**

**JUDGMENT AFFIRMED IN ALL OTHER RESPECTS.**

COSTS TO BE PAID ONE HALF BY APPELLANT
AND ONE HALF BY APPELLEE.